**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PACIFIC ERECTORS, INC., Respondent.**

No. 82–7767.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 6, 1983.

Decided Oct. 25, 1983.

Thomas I. Kramer, Portland, Or., for respondent.

Susan Williams, Seattle, Wash., for petitioner.

Before WRIGHT, CHOY and NELSON, Circuit Judges.

NELSON, Circuit Judge:

The NLRB petitions for enforcement of its order finding that Pacific Erectors, Inc. (the Employer) violated National Labor Relations Act § 8(a)(1), (2), (5), 29 U.S.C. § 158(a)(1), (2), (5) (1976). The Employer had signed a prehire agreement with the

International Association of Bridge, Structural & Ornamental Ironworkers, Local No. 29 (Ironworkers), and subsequently hired a crew of Ironworkers to work on a roofing project. *See* National Labor Relations Act § 8(f), 29 U.S.C. § 158(f) (1976). When the work went poorly, the Company laid off three workers, and the remaining seven quit in sympathy. Rather than going to the union for more workers as the collective bargaining agreement required, the Employer signed a new agreement with the Sheet Metal Workers Union and employed its members to finish the job.

The Board found that the Employer violated the National Labor Relations Act by breaching the agreement, refusing to bargain, and making a new agreement with the Sheet Metal Workers Union, and ordered various remedial measures. The Employer argues on appeal that it was not obligated to bargain because the Ironworkers had a voidable prehire agreement. We find that the Ironworkers established a rebuttable presumption of majority representation by virtue of majority membership in that union at the time the job began. This converted a voidable prehire agreement into a binding collective bargaining agreement. The Employer also argues that there was not sufficient evidence to support the Board's findings. We find that there was sufficient evidence to justify the unfair labor practice findings, and grant enforcement to the Board's order.

## FACTS AND PROCEDURAL BACKGROUND

The Employer is a roofing contractor. On November 22, 1974, it signed a prehire agreement with the Ironworkers. This was a "short form" agreement by which the Company agreed to be bound by the terms of the Master Labor Agreement between the Oregon-Columbia Chapter, Associated General Contractors of America, Inc., and the Ironworkers (Agreement), except for dispute settlement provisions. The Agreement included a "hiring hall" provision, stating that a signatory employer may hire from other sources only if the Ironworkers are unable to supply qualified workers within 48 hours.[1] The Agreement also contained a union security clause requiring covered employees to become members of the union.

This case results from an August 18, 1977 labor dispute at the Tualatin, Oregon jobsite where the Employer had contracted to install a metal roof on a tennis court. From the beginning of the job on June 1 until the date of the dispute, all the Employer's employees on the Tualatin jobsite were Ironworkers. On August 17, some workers left the site without properly securing certain roofing materials. When Abrams, an officer of the Employer, discovered the problem on the following day, he laid off the three responsible employees. The remaining seven then requested final paychecks in sympathy with the three discharged workers. There was conflicting testimony before the Administrative Law Judge as to what further inquiries the workers made about continuing on the job, but Abrams treated their termination as final.

Abrams did not attempt to hire an alternate crew from the Ironworkers. Instead, he signed a collective bargaining agreement with Sheet Metal Workers Local 16 later on August 18, and their workers finished the job.

The Ironworkers filed charges with the NLRB. The ALJ, later affirmed by the

1. The Agreement provides in pertinent part: It is recognized within the construction industry that the Union affords the first source of qualified ironworkers in the classifications covered by this Agreement. When the Employer calls upon the Union for ironworkers such Employer shall have the right to reject any job applicant for just cause, and if the Union is unable to supply qualified ironworkers within forty-eight (48) hours (Saturdays, Sundays and holidays excepted) the employer may hire from other sources. If an Employer chooses to hire ironworkers from sources other than the Union having jurisdiction over the work because the Union cannot furnish the ironworkers, the Union shall be given notice thereof not later than three (3) days from the date of such hiring, which notice shall include the names, addresses, classifications and social security numbers of the ironworkers hired.

Board, found that the Employer had violated the National Labor Relations Act (Act) in two ways:

1. By withdrawing recognition from the Ironworkers and refusing to honor the conditions of the collective bargaining agreement without first bargaining with the Ironworkers, the Company violated section 8(a)(1) and (5) of the Act.

2. By making and enforcing the collective bargaining agreement with the Sheet Metal Workers, the Employer violated section 8(a)(1) and (2) of the Act.

The Board ordered the Employer to: 1) cease and desist from the unfair labor practices; 2) pay those Ironworkers who would have been referred by the union to replace the terminated workers; and 3) post an appropriate notice. The Board brings this action for enforcement under National Labor Relations Act § 10(e), 29 U.S.C. § 160(e).

## ISSUES

I. Did the Employer have a binding collective bargaining agreement with the Ironworkers as of August 18?

II. Was there substantial evidence for the Board to find that the Employer violated section 8(a)(1) and (5) of the Act by refusing to honor the agreement and by refusing to bargain.

III. Was there substantial evidence for the Board to find that the Employer violated section 8(a)(2) and (1) of the Act by executing an agreement with the Sheet Metal Workers during the course of a job for which the Ironworkers had binding agreement?

## STANDARD OF REVIEW

 A Board finding of fact must be accepted if supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456, 467–468 (1951); 29 U.S.C. § 160(f) (1976). If the Board's application of these findings is rational and consistent with the Act, the order is entitled to enforcement. *Beth Israel Hospital v. NLRB,* 437 U.S. 483, 501, 98 S.Ct. 2463, 2473–74, 57 L.Ed.2d 370, 386

(1978); *Construction Erectors, Inc. v. NLRB,* 661 F.2d 801, 803 (9th Cir.1981). Reviewing courts give special weight to the administrative law judge's determinations concerning the credibility of witnesses "[w]hen conflicting testimony is presented at a hearing." *Clear Pine Mouldings, Inc. v. NLRB,* 632 F.2d 721, 724 (9th Cir.1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2317, 68 L.Ed.2d 841 (1981).

## DISCUSSION

### I.

*The Company Was Bound by the Collective Bargaining Agreement Once the Job Began*

The Employer makes two arguments that it was not bound by the Agreement as of August 18. The first is that the Ironworkers no longer had majority support after all their workers were terminated. The second is that the Ironworkers' unsatisfactory performance constituted a material breach of their common-law duty of good faith and fair dealing, which discharged the Employer's duties under the agreement. We address these contentions in turn.

A. *The Ironworkers Had an Enforceable Collective Bargaining Agreement on August 18*

 It is an unfair labor practice for an employer to sign a collective bargaining agreement recognizing a minority union as an exclusive bargaining representative. *International Ladies' Garment Workers Union v. NLRB,* 366 U.S. 731, 373–40, 81 S.Ct. 1603, 1607–08, 6 L.Ed.2d 762, 767–69 (1961), *Construction Erectors, Inc. v. NLRB,* 661 F.2d 801, 803 (9th Cir.1981) (*Construction Erectors*). However, to accommodate the fluidity of construction employment, Congress enacted NLRA § 8(f), 29 U.S.C. § 158(f) (1976), which allows a construction employer to execute a prehire agreement for union representation before a majority is established. *Jim McNeff, Inc. v. Todd,* —— U.S. ——, ——, 103 S.Ct. 1753, 1756–57, 75 L.Ed.2d 830, 836–837 (1983).

 Until a union establishes a majority, an employer is free to repudiate an 8(f) agreement at any time. *NLRB v. Local*

*Union No. 103, International Association of Bridge, Structural & Ornamental Ironworkers,* 434 U.S. 335, 345, 98 S.Ct. 651, 657–58, 54 L.Ed.2d 586, 595–96 (1978) (*Higdon*). Once a union achieves majority status, "the prehire agreement attains the status of a collective bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." 434 U.S. at 350, 98 S.Ct. at 660, 54 L.Ed.2d at 598–99. Majority status thus converts a voidable 8(f) agreement into a binding section 9(a) exclusive representation agreement. After that time, the employer must require an incumbent union's representation during the term of an agreement up to three years in length. *Precision Striping, Inc. v. NLRB,* 642 F.2d 1144, 1147 (9th Cir.1981); *see Pioneer Inn Associates v. NLRB,* 578 F.2d 835, 838 (9th Cir.1978).

■ This circuit recognizes two methods of demonstrating majority status. If the agreement covers a permanent and stable unit of employees, the contract is converted into a binding agreement covering all employees from the time the union establishes majority support. *E.g., Construction Erectors,* 661 F.2d at 803–04. Once a majority of the company's employees belong to the union, a rebuttable presumption of the union's majority status is created. *Authorized Air Conditioning Co. v. NLRB,* 606 F.2d 899, 906 (9th Cir.1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1598, 63 L.Ed.2d 785 (1980); *see Precision Striping,* 642 F.2d at 1148 (majority membership does not raise an irrebuttable presumption of majority support).

■ If an employer has no stable work force and hires on a job-to-job basis, "the employer's duty to bargain and honor the contract is contingent on the union's attaining majority support at the various construction sites." *Higdon,* 434 U.S. at 345, 98 S.Ct. at 657–58, 54 L.Ed.2d at 596. This court has stated: " '[T]he union must demonstrate its majority status at each new jobsite in order to invoke the provisions of section 8(a)(5) of the Act.' " *Construction Erectors,* 661 F.2d at 804 (citing *Hageman Underground Construction,* 253 N.L.R.B. 60 (1980)). The Union in this case does not claim that the Employer had a permanent and stable unit of employees. It claims to have demonstrated majority support at the Tualatin jobsite by establishing unanimous union membership from the first day of work. The Employer argues that this was insufficient because " 'union membership is not always an accurate barometer of union support.' " *Precision Striping, Inc. v. NLRB,* 642 F.2d 1144, 1148 (9th Cir.1981) (quoting *Authorized Air Conditioning Co. v. NLRB,* 606 F.2d 899, 906 (9th Cir.1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1598, 63 L.Ed.2d 785 (1980)). We disagree. The Employer is correct that union membership does not conclusively establish union support, and evidence of a lack of support may be considered. Nonetheless, it would be inappropriate to require a union to present definitive evidence of majority support, such as a representation election, with regard to every jobsite covered by a prehire agreement. This would violate the legitimate expectations of workers who, as members of a union working on a job covered by a prehire agreement, will consider themselves covered by a union contract. Moreover, such a rule would interfere with Congress's intent to make the prehire agreement a simple way of allowing unions to represent construction industry workers.

The Third Circuit considered this question in *NLRB v. Irvin,* 475 F.2d 1265 (1973), a case cited with approval in *Higdon,* 434 U.S. at 345, 98 S.Ct. at 658, 54 L.Ed.2d at 596. *Irvin* held that there was a rebuttable presumption of majority union support where a union security agreement had resulted in majority union memberships on projects to which an 8(f) prehire agreement applied. 475 F.2d at 1269–71. The court reasoned:

Nothing in either the text or the legislative history of § 8(f) suggests that it was intended to leave construction industry employers free to repudiate contracts at will. . . . [T]he employees did not . . . petition for a representation election. There was at least tacit acquiescence in the designation of District 50 as collective bargaining representative. Whatever may be the correct rule in the absence of union security and dues checkoff clauses, at least where the union's rule has by the operation of such clauses been brought

home to the employees quite directly, and they have refrained from seeking a representation election, an employer is not free to repudiate his § 8(f) contract during its term. *Id.* at 1271. We similarly hold that majority representation on a particular jobsite, where a union's purported representation has been brought to the attention of the employees either by union security clauses, dues checkoff clauses, or otherwise, creates a rebuttable presumption of majority support of that union for purposes of making a voidable section 8(f) prehire agreement binding under section 9(a).

 In this case, the employees were made aware of the Ironworkers' representation by various means. There was a union security clause that required any employee on the job for more than eight days to join the Ironworkers.[2] This fact, combined with majority union membership, established a rebuttable presumption of employee support for the Ironworkers. The Employer did not present any evidence to rebut that presumption, and the Board did not err in finding that the Ironworkers was the workers' exclusive bargaining representative under section 9(a).

The events of August 18 did not change the fact of the Ironworkers' majority representation. The Employer does not question that the last seven employees left because the first three had been laid off. National Labor Relations Act section 2(3) defines "employee" to include "any individual whose work has ceased as consequence of, or in connection with, any current labor dispute." 29 U.S.C. § 152(3). The discharge of the ten employees was a "controversy concerning terms, tenure or conditions of employment," and therefore a "labor dispute" under National Labor Relations Act section 2(9), 29 U.S.C. § 152(9). The terminated Ironworkers thus retained their status as employees for purposes of section 9(a)'s guarantee that the designated representative of "the majority of the employees . . . shall be the exclusive representative for the purposes of collective bargaining." Therefore, the Company remained bound under the Agreement at all times relevant to this case.

**B.** *The Union Did Not "Materially Breach" the Agreement So as to Excuse the Company's Obligations*

The Company argues that the Union breached its contract by referring unsatisfactory workers and refusing to address the problems created by its referrals. Its position is that the Union's conduct violated the "duty of good faith and fair dealing in [the contract's] performance and its enforcement." Restatement (Second) of Contracts § 205 (1981).

 The Company cites no authority for the proposition that a material breach excuses the duty to bargain. While it may excuse the performance of the more tangible duties under the contract, the duty to bargain may be like the duty to arbitrate, which the Second Circuit has decided is not discharged by a material breach. *Rochdale Village, Inc. v. Public Service Employees Union, Local No. 80,* 605 F.2d 1290, 1297 (2d Cir.1979). We need not decide the question, however, because we find that there was substantial evidence in the record to support the finding that the Ironworkers did not commit a material breach of the agreement. As the Administrative Law Judge's opinion noted, the contention that the Union's performance was unsatisfactory "is based upon the general and conclusionary testimony of Abrams, who is not credited." Based on the record, we have no reason to dispute this credibility determination. *See NLRB v. Don Burgess Construction Corp.,* 596 F.2d 378, 383 (9th Cir.1979), *cert. denied,* 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979) (quoting *NLRB v. Anthony Co.,* 557 F.2d 692, 695 (9th Cir.1977) (NLRB credibility determinations will be sustained

---

2. The Agreement provides in pertinent part: All ironworkers employed by the Employer to perform work within the properly determined craft jurisdiction of the Union involved may be required to become members of such Union not later than the 8th day following the beginning of such employment or since the inception of this Agreement, and thereafter shall maintain membership in good standing in said Union as a condition of employment. . . .

by this court "unless found to be inherently incredible or patently unreasonable" (citations omitted)).

## II.

*There Was Substantial Evidence That the Company Violated Section 8(a)(1) and (5) of the Act By Refusing to Honor the Agreement and Refusing to Bargain*

■ Section 8(a)(5) requires an employer to "bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Bargaining is required "with respect to wages, hours, and other terms and conditions of employment," as well as "any question arising [under a collective bargaining agreement]." National Labor Relations Act § 8(d), 29 U.S.C. § 158(d). In this case, the Company refused to honor the Agreement by repudiating the Ironworkers' representation and by failing to hire Ironworkers to replace the former workers. This failure to abide by the contract constituted a violation of section 8(a)(1), and the failure to bargain before taking these actions violated section 8(a)(5). *E.g., Authorized Air Conditioning, Inc. v. NLRB,* 606 F.2d 899 (9th Cir.1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1598, 63 L.Ed.2d 785 (1980).

## III.

*There Was Substantial Evidence That the Company Violated Section 8(a)(2) and (1) by Executing a Collective Bargaining Agreement With the Sheet Metal Workers Union*

■ As found above, section 9(a) of the Act required the Company to deal with the Ironworkers as the exclusive representative of the employees at all relevant times. The Company's refusal to deal with the Ironworkers thus violated section 8(a)(1) by interfering with the employees' organizational rights. The Sheet Metal Workers Union, with no support among the Employer's lawful employees, were a minority union. The Supreme Court has held that "a grant of exclusive recognition to a minority union constitutes unlawful support in violation of" National Labor Relations Act section

8(a)(2), 29 U.S.C. § 158(a)(2). *ILGWU v. NLRB,* 366 U.S. 731, 738, 81 S.Ct. 1603, 1607, 6 L.Ed.2d 762, 768 (1961). A good faith belief in the minority union's right to represent the employees is no defense. *Id.* at 738–39, 81 S.Ct. at 1607–1608. The illegal recognition of the Sheet Metal Workers Union therefore violated section 8(a)(2) by lending unlawful support to a minority union. *ILGWU,* 366 U.S. at 732–33, 81 S.Ct. at 1604–05, 6 L.Ed.2d at 764–65.

## CONCLUSION

Once a majority of Ironworkers came to work on the Tualatin jobsite, the Employer was as completely bound by the Agreement with the Ironworkers as any employer who has a collective bargaining agreement covered by National Labor Relations Act section 9(a). The Company's violation of the contractual terms, refusal to bargain, and agreement with a minority union thus violated section 8(a)(1), (2), and (5). The Board's order is therefore

ENFORCED.