**MESA VERDE CONSTRUCTION CO., Plaintiff,**

v.

**NORTHERN CALIFORNIA DISTRICT COUNCIL OF LABORERS, Defendant.**

**No. C–84–4389–WWS.**

United States District Court,
N.D. California.

Dec. 13, 1984.

Mark R. Thierman, Deborah E.G. Wilder, Thierman, Simpson & Cook, San Francisco, Cal., for plaintiff.

Victor J. Van Bourg, Van Bourg, Weinberg, Roger & Rosenbeld, San Francisco, Cal., for defendant.

## ORDER

SCHWARZER, District Judge.

Plaintiff Mesa Verde Construction Company ("Mesa Verde") brings this action against Defendant Northern California District Council of Laborers ("the Union") seeking a declaration that it is not obligated to arbitrate a grievance under the terms of an agreement with the Union. Mesa Verde contends that the agreement was a pre-hire agreement within the meaning of § 8(f) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(f) (1976)[1] and was repudiated before the date on which the grievance was filed.

## FACTS

Mesa Verde has performed contracting work in California since June 1977. On August 13, 1979, it entered into a memorandum agreement with the Union. The memorandum agreement incorporated an industry master agreement which is not before the Court, and provided that it would remain in effect until June 15, 1980, and continue from year to year thereafter unless either party gave written notice of intention to change or cancel by April 15th. This agreement remained in effect until a second memorandum agreement was signed on June 26, 1980, incorporating by reference all of the terms and conditions of the 1980–83 Master Agreement between the Associated General Contractors of California, Inc. and the Northern California District of Laborers. This memorandum agreement provided that it would remain in full force and effect until June 15, 1983, and continue from year to year thereafter unless either party gave written notice within the time provided in the agreement.

On November 17, 1982, the terms of the June 1980 agreement were modified and extended to June 15, 1986. It is the June 1980 agreement which is the subject of this action.

The Master Agreement defined the scope of covered laborers' work and designated the counties to which it applied. That agreement also contained a union security clause requiring any employee on the job for more than eight days to join the Union.

On May 15, 1984, Mesa Verde's attorney sent a letter to the Union stating that Mesa Verde was abrogating "any and all agreements" with the Union. As of that date, Mesa Verde operated on only one jobsite, the Lucky Hercules Project. Thereafter, in June, 1984, the Union filed a grievance against Mesa Verde with respect to work at a different jobsite at Orland, California, after May 27, 1984.

Mesa Verde brings this action seeking relief in the form of a declaration that it is not obligated to arbitrate this grievance which arose at a new jobsite after its notice of termination. Jurisdiction is premised on § 301 of the Act. On July 16, 1984, this Court stayed arbitration of the grievance pending resolution of Mesa Verde's declaratory relief action. A motion to reconsider that stay was denied on August 31. Mesa Verde now moves for summary judgment. Inasmuch as no material facts are in dispute, disposition by summary judgment is appropriate.

## DISCUSSION

Mesa Verde's motion and the Union's opposition raise three issues:

1. Section 8(f) provides in pertinent part:

 It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because

 (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such an agreement.... *Provided,* That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: *Provided further,* That any agreement which would be invalid, but for the clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.
 29 U.S.C. § 158(f).

1. Was the agreement repudiated on May 15, 1984, a pre-hire agreement within the meaning of § 8(f)?

2. If the agreement was a pre-hire agreement, is this court a proper forum to determine whether the repudiation was effective?

3. If the court may make that determination, was the letter sent to the Union effective to repudiate the agreement?

### I. Was the Agreement a Pre-Hire Agreement?

Mesa Verde asserts that it was free to repudiate the memorandum agreement because that agreement did not become a binding collective bargaining agreement but was only a voidable pre-hire agreement under § 8(f).

 Although it is an unfair labor practice for an employer to sign a collective bargaining agreement recognizing a minority union as an exclusive bargaining representative, *International Ladies' Garment Workers Union v. NLRB*, 366 U.S. 731, 737–39, 81 S.Ct. 1603, 1607–08, 6 L.Ed.2d 762 (1961), to accommodate the fluidity of construction industry employment, § 8(f) allows an employer in that industry to execute a pre-hire agreement before a majority is established. *Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 103 S.Ct. 1753, 1756–57, 75 L.Ed.2d 830 (1983). While the statute by its terms does not provide for repudiation, the Supreme Court has held that parties may repudiate pre-hire agreements "until and unless such time as the union achieves majority support in the relevant bargaining unit." *Jim McNeff, Inc. v. Todd*, 103 S.Ct. at 1753–54; *NLRB v. Local Union No. 103, International Association of Bridge, Structural and Ornamental Ironworkers*, 434 U.S. 335, 345, 98 S.Ct. 651, 657, 54 L.Ed.2d 586 (1978) ("*Higdon*"). Once a union achieves majority status, "the pre-hire agreement attains the status of a collective bargaining agreement executed by the employer with a union representing a majority of the employees in the unit." *Higdon*, 434 U.S. at 350, 98 S.Ct. at 660. Majority status thus converts a voidable § 8(f) agreement into a binding collective bargaining agreement under § 9(a).

### A. Jurisdiction

 The Union contends that before majority status can be ascertained, a determination of the appropriate bargaining unit must be made. The Union argues that the court is without jurisdiction to determine the appropriate bargaining unit and therefore cannot reach the question of majority status. It is true that "bargaining unit determination is a representational question reserved in the first instance to the Board ... [and] a district court does not have jurisdiction to address this question in a section 301 suit." *Carpenters Local Union No. 1478 v. Stevens*, 743 F.2d 1271, at 1278 (9th Cir.1984). The primary jurisdiction rule, however, does not apply where the party raising the issue has no standing to raise it before the National Labor Relations Board. *Laborers Health & Welfare Trust Fund v. Kaufman & Broad of Northern California, Inc.*, 707 F.2d 412, 415–16 (9th Cir.1983). This rationale was recently extended to defenses which cannot be presented to the Board. *Operating Engineers Pension Trust v. Beck Engineering & Surveying Co.*, 746 F.2d 557, at 565 (9th Cir.1984).

 The Union's argument is premised on the notion that effective repudiation of a pre-hire agreement can only follow a determination of the appropriate bargaining unit in connection with a representation election. The case before this Court, however, involves a repudiation as to future jobsites for which no laborers have yet been hired. No bargaining unit determination could be made with respect to non-existent jobs nor could an election be held. The Union's argument is therefore irrelevant.

### B. Majority Status

 Majority status sufficient to convert a voidable § 8(f) agreement into a binding § 9(a) agreement may be established in one of two ways:

If the agreement covers a permanent and stable unit of employees, the contract is converted into a binding agreement covering all employees from the time the union establishes majority support. Once a majority of the company employees belong to the union, a rebuttable presumption of the union's majority status is created.

If an employer has no stable workforce and hires on a job-to-job basis, "the employer's duty to bargain and honor the contract is contingent on the union's attaining majority support at the various construction sites." *Higdon*, 434 U.S. at 345 [98 S.Ct. at 657]. "The union must demonstrate its majority status at each new jobsite in order to invoke the provisions of section 8(a)(5) of the Act." *Construction Erectors, Inc. v. N.L.R.B.*, 661 F.2d 801, 804 (9th Cir.1981) (*citing Hageman Underground Construction*, 253 N.L.R.B. 60 (1980)).

*N.L.R.B. v. Pacific Erectors, Inc.*, 718 F.2d 1459, 1463 (9th Cir.1983).

The Union makes three arguments. First, the Union argues that because it first entered into an agreement with Mesa Verde in 1979, the subsequent June 26, 1980, agreement was a part of an existing bargaining relationship and therefore could not be a pre-hire agreement. The National Labor Relations Board has held that the concept of a pre-hire agreement applies only to the initial § 8(f) agreement and not to succeeding contracts. See e.g. *Custom Sheet Metal and Service Co.*, 243 N.L.R.B. 1102 (1979); *Williams Enterprise, Inc.*, 212 N.L.R.B. 880 (1974), *enforced* 89 LRRM 2190 (4th Cir.1975); *Dallas Building & Construction Trades Council*, 164 N.L.R.B. 938 (1967), *enforced* 396 F.2d 677 (D.C.Cir.1968); *Bricklayers & Masons Local 3*, 162 N.L.R.B. 476 (1966), *enforced* 405 F.2d 469 (9th Cir.1968). Thus in *Bricklayers & Mason Local 3*, the Board enforced a collective bargaining agreement whose origin was a pre-hire agreement. The Board found this origin to be irrelevant in light of the subsequent dealings between the parties:

It is apparent from the foregoing that the bargaining between the AGC and the Union presents the situation of a continuing bargaining relationship; a situation quite different from that which Congress had in mind when enacting Section 8(f)(1), to wit, an initial attempt by a union and an employer in the construction industry to commence such a relationship. Thus, the entire legislative history of Section 8(f)(1) is couched in terms of "prehire agreement," a reference which can have no meaning is the situation where, as here, the parties are continuing an existing bargaining relationship under which employees have previously been hired. 162 NLRB at 478

These cases, however, in which the Board determined that successive agreements could not be characterized as § 8(f) agreements, involved what *Pacific Erectors* described as a permanent and stable workforce. But when an employer hires on a jobsite-by-jobsite basis, a § 8(f) agreement matures into a binding § 9(a) agreement only as to a jobsite on which the union attains majority status. *Id.* at 1463. In *Dee Cee Floor Covering, Inc.*, 232 N.L.R.B. 421 (1977), the Board noted that "the mere fact that the Union might indeed have represented a majority of the employees at Respondent Dee Cee's previous job sites is of no consequence inasmuch as the Union must demonstrate its majority at each new jobsite in order to invoke the provisions of § 8(a)(5) of the Act." *Id.* at 422. In the absence of a permanent stable workforce, therefore, any binding collective bargaining relationship established at any jobsite under the 1979 agreement between Mesa Verde and the Union could have no effect on future jobsites.

Second, Mesa Verde argues that, even ignoring the 1979 agreement, the 1980 agreement could not have been a pre-hire agreement because at the time of its signing, the Union represented a majority of the laborers on the Mesa Verde payroll. It is not disputed that in June 1980, ten laborers were on the payroll of whom seven were Union members. These ten men were

employed on three different jobs: Job # 150, Job # 170 and Job # 175; none worked at more than one job.

This argument must be rejected in light of the decision in *Acme Marble & Granite Co., Inc.,* 271 N.L.R.B. No. 147 (August 9, 1984). There a cemetery developer performed approximately 30 to 40 jobs in 36 different states. The developer began a project in Missouri in September, 1976, and started another project in Kansas in October, 1976. On October 27, 1976, he entered into an agreement in western Missouri and Kansas with locals of the Laborers' International Union of North America. The developer adhered to the terms of the agreement as to the two jobsites, but refused to apply the agreement to a third job commenced after completion of the earlier two.

The Board rejected the argument that the Union had become a § 9(a) representative because on the date the contract was executed, the Union represented a majority of the developer's employees in the geographic area covered by the contract, noting that "there is nothing in the Act to indicate that the Union's geographical jurisdiction establishes the bargaining unit." [2] It followed *Dee Cee Floor Covering, Inc.,* stating that the Union must demonstrate majority status at each new jobsite regardless of majority status at previous projects. 232 N.L.R.B. at 422. Applying the *Acme Marble* analysis here, the Union's majority status at three different projects at the time of the June 26, 1980, agreement is irrelevant; the June 26, 1980, agreement remained a pre-hire agreement as to future jobsites.

Third, the Union argues that even if the agreement was a pre-hire agreement when it was signed, the Union attained majority status in 1981 in a stable and permanent workforce and was therefore entitled to a presumption of majority status for the life of the agreement. The Board has accorded a union achieving majority status in a permanent and stable workforce at any time during the term of the collective bargaining agreement an irrebuttable presumption of majority status for the duration of the agreement.[3] *Construction Erectors, Inc.,* 265 N.L.R.B. 786 (1982); *Hageman Underground Construction,* 253 N.L.R.B. 60 (1980). The Union relies on those decisions to support its argument.

In *Construction Erectors, Inc.,* the Board stated the test for determining whether a stable and permanent workforce exists, considering the special nature of the construction industry:

> [W]e believe it is important to emphasize that the determination of whether the workforce is "permanent and stable" is more than a mechanical exercise in tabulating the makeup, longevity, and fluctuation of a group of employees. For in making the determination, the Board ultimately is deciding whether the workforce is of such a nature that a showing of majority support made at a particular point in time reasonably can be said to have significance at a subsequent time. In this regard, we do not require a showing that the workforce is a stable group of employees who work for a long period of time with no fluctuation in the overall
>
> \* \* \* \* \* \*
>
> In the building and construction industry it is customary for employers to enter into collective-bargaining agreements for periods of time running into the future, perhaps 1 year or in many instances as much as 3 years. Since the vast majority of building projects are of relatively short duration, such labor agreements sometimes apply to jobs which have not been started.

**2.** The Board was persuaded by the developer's argument that Congress intended that each jobsite establishes the relevant unit. The developer relied on the following language from H.R.Rep. No. 741, 86th Cong., 1st Sess. 19 (1959), reprinted at [1959] U.S.Code Cong. & Admin.News 2318, 2441–2442; 1 Leg.Hist. 777:

> The occasional nature of the employment relationship makes this industry markedly different from manufacturing and other types of enterprise. An individual employee typically works for many employers and for none of them continuously. Jobs are frequently of short duration, depending upon various stages of construction.

**3.** The Ninth Circuit has recognized only a rebuttable presumption. *Precision Striping, Inc. v. NLRB,* 642 F.2d 1144 (9th Cir.1981)

unit. Indeed, in view of the special nature of the construction industry, such a requirement would virtually eliminate the possibility of finding a construction industry workforce that is "permanent and stable".... In short, our analysis in cases of this nature must go beyond the calculation of numbers and dates and focus upon the issue of whether the employee complement possesses sufficient continuity as to merit continued reliance on showing of majority support for the union made at any point during the relevant period.

*Id.* at 787 (footnotes omitted).

In *Construction Erectors, Inc.* the Board found a permanent and stable workforce on evidence that the company moved its ironworkers from job to job and did not hire them for a single job only. Of 47 ironworkers employed by the company, 15 worked for seven or more months on approximately 75% of the total number of days on which ironworkers were employed. The Board noted:

[W]e rely particularly on the fact that throughout the relevant period, Respondent moved its employees from job to job and did not regularly assign employees to single jobs and then to no subsequent jobs. Thus, the instant case is readily distinguishable from those where employees are hired on a jobsite-by-jobsite basis with little or no carryover from job to job. In addition, we also find of substantial significance the existence of a basic core group of employees utilized by Respondent throughout the relevant period. As noted, this group of employees worked approximately 75% of the total number of days on which ironworkers were employed and, again, moved from job to job.

*Id.* at 788.

In *Hageman Underground Construction, supra,* the Board also found a permanent and stable workforce. Hageman entered into a contract with the union in September, 1977, by which it agreed to recognize the union as the collective bargaining representative for its backhoe operators. Hageman complied with the terms of the contract until repudiation in March 1979. The company employed three backhoe operators who operated the company's four machines, but occasionally hired additional operators for brief periods. Between October 1977 and April 1978, the three operators were transferred from job to job. The Board concluded that the union represented a majority of the employees in a permanent and stable workforce of backhoe operators:

An examination of the record pertaining to the backhoe operators alone reveals that between October 1977 and April 1978, a substantial period during the contract, [one-third of the contract period], Respondent utilized a permanent and stable group of backhoe operators and did not generally hire on a project-by-project basis. In this regard, it is undisputed that [the three operators] operated backhoes for Respondent at various jobsites during this period and that they were not re-hired for each project. Rather, ... these men were moved from project to project.... While [one of the operators] was terminated in April 1978, and ... Respondent subsequently may have hired new backhoe operators as a result of turnover, there is no evidence suggesting that Respondent ever abandoned its practice of using a stable complement to operate its four backhoes.

*Id.* at 62–63.

The Union argues that it attained majority status among a "stable and permanent workforce on a multi-site basis" in 1981, and thus is entitled to a presumption of majority status for the life of the agreement. It points out that in 1981, Mesa Verde had four main jobs on which it employed laborers: Jobs #200, #205, #210 and #230. At all these jobsites, the union represented a majority of the workers. Additionally, five of the six laborers who worked on job #200 were the five laborers on job #210.

Neither *Construction Erectors, Inc.* nor *Hageman Underground* support the Union's argument. The undisputed evidence

compels the conclusion that the Union has failed to show sufficient continuity of employment to merit continued reliance on the asserted majority status. *Construction Erectors, Inc.*, 256 N.L.R.B. at 787. The ten months period during which five laborers were employed on both Jobs # 200 and # 210 represents less than one-fifth of the contract period (July 1980-May 1984). Moreover, the extent of overlap for three of the five employees was insignificant; one worked five hours on the second job, a second worked eight hours on the second job, and a third laborer worked 55 hours on the second job. Further, an examination of the over-all work performed during the contract period indicates that 48 laborers were employed on 11 different jobs. Of these 48 laborers, only 13 worked on more than one job; 11 worked on two jobs; only two worked on four jobs; and only one worked on six jobs. Unlike in *Construction Erectors, Inc.* and *Hageman Underground*, these statistics fail to show the existence of a core group of a significant portion of the total number of employees moving from project to project during a substantial period of the contract. Rather they demonstrate that employees "are hired on a jobsite by jobsite basis with little or no carryover from job to job." *Construction Erectors, Inc.*, 265 N.L.R.B. at 788. Thus, at no time did the Union achieve a majority in a stable and permanent workforce sufficient to bind Mesa Verde under the agreement as to future jobsites.

### C. *Timing of the Repudiation*

At the time that Mesa Verde abrogated the agreement on May 15, 1984, its Lucky Hercules Project was still in operation. Mesa Verde continued to make Trust Fund contributions after May 15, 1984, for laborers employed on that project. Mesa Verde argues that when a pre-hire agreement is abrogated and there is an ongoing project on which the union represents a majority of the employees, the employer must continue to comply with the collective bargaining agreement on that project until it is completed and the employees are terminated. The repudiation is effective, however, as to future jobsites. The Union rejects this argument and contends that Mesa Verde could not repudiate the agreement at a time when the Union had majority status on any jobsite.

Under *Dee Cee Floor Covering, Inc.*, *supra*, however, a § 8(f) pre-hire agreement does not become enforceable until the union demonstrates majority status, and, in the case of a project-by-project employer, majority status must be separately demonstrated at each job site. Contrary to the Union's claim, the Board has not "cut back on its opinion in *Dee Cee Floor Covering.*" Recent cases continue to make this distinction between project-by-project employers and those having a permanent and stable workforce, all citing *Dee Cee Floor Covering.* See *Acme Marble & Granite Co., Inc.*, 271 N.L.R.B. No. 147 (August 9, 1984); *Construction Erectors, Inc.*, 265 N.L.R.B. 786 (1982); *Giordano Construction Co.*, 256 N.L.R.B. 47 (1981); *Hageman Underground Construction*, 253 N.L.R.B. 60 (1980). The Ninth Circuit approved this rule in *N.L.R.B. v. Pacific Erectors, Inc.*, 718 F.2d 1459 (9th Cir.1983).

Inasmuch as a prehire agreement may be repudiated "until and unless such time as the union achieves majority status in the relevant unit," *Jim McNeff, Inc. v. Todd*, 103 S.Ct. at 1753–54, Mesa Verde, as a jobsite-by-jobsite employer, was entitled to repudiate its agreement as to all projects on which the Union had not then attained a majority. Under the decisions of the Board and the Ninth Circuit, in the absence of a permanent and stable workforce, each jobsite is assessed independently of every other jobsite. If the union has acquired majority status on a particular jobsite, the agreement becomes a binding collective bargaining agreement only as to that jobsite. Thus, Mesa Verde remained bound by the collective bargaining agreement on the Lucky Hercules Project but not on future jobsites. See also *Irvin-McKelvey Co.*, 194 N.L.R.B. 52 (1971), *enforced in part sub. nom. N.L.R.B. v. Irvin*, 475 F.2d 1265 (3d Cir.1973).

II. *Is this Court the Proper Forum to Determine Whether the Repudiation was Effective?*

■ Section 9 of the Mesa Verde-Union agreement provides that "any dispute concerning the interpretation or application of the agreement shall be submitted to arbitration." The Union argues that the scope of the clause is broad enough to encompass a claim of repudiation of the collective bargaining agreement and hence the issue must be decided in arbitration. It relies on the general rule stated in *California Trucking Association v. Brotherhood of Teamsters and Auto Truck Drivers Local 70*, 679 F.2d 1275, 1282 (9th Cir.1981), that "the issue whether repudiation has occurred must normally be submitted to arbitration when the contract calls for arbitral resolution of questions arising under the collective bargaining agreement."

The Union's argument ignores the "important distinctions between collective bargaining agreements and prehire agreements." *Northern California District Council of Laborers v. Robles Concrete Company*, 149 Cal.App.3d 289, 293, 196 Cal.Rptr. 776 (1983). Mesa Verde's right to abrogate the agreement is based on a federal statute, not on a contractual provision. "An arbitrator is confined to interpretation and application of the collective bargaining agreement." *United Steelworkers v. Enterprise Wheel and Car. Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). Since the issue of pre-hire agreement repudiation is statutory, rather than contractual, it is properly decided by the Court.

III. *Did the Letter Sent to the Union Repudiate the Agreement?*

■ Mesa Verde's attorney wrote to the Business Manager for the Union on May 15, 1984, informing him that Mesa Verde was abrogating "any and all labor contracts" with the Union. Mesa Verde contends that the letter was effective to repudiate the agreement. The Union argues that an election held under § 9 of the

Act is the exclusive means by which a § 8(f) agreement may be repudiated.

The Supreme Court in *Jim McNeff, Inc. v. Todd, supra*, declined to decide what constitutes an effective repudiation of a § 8(f) prehire agreement. In a footnote, it stated:

> It is not necessary to decide in this case what specific acts would effect the repudiation of a pre-hire agreement—sending notice to the union, engaging in activity overtly and completely inconsistent with contractual obligations, or, as respondents suggest, precipitating a representation election pursuant to the final provision of § 8(f) that shows the union does not enjoy majority support.
> 103 S.Ct. at 1759 n. 11

The Ninth Circuit recently addressed the issue in the case of a single employee unit. *Operating Engineers Pension Trust v. Beck Engineering & Surveying Co.*, 746 F.2d 557 (N.D.Cal.1984) The Trust there argued that a letter sent by the employer was not an effective means of repudiation. The court rejected the argument, noting that as a matter of long-standing policy, the Board will not certify or find appropriate a single-person bargaining unit for a representation election. *Id.* at 564. "Since the Board may not and will not ascertain majority status in a single-employee unit, it would be futile for the employer of a single employee to petition the Board for a representation election in order to repudiate his Section 8(f) pre-hire agreement. *Id.* Accordingly, a construction industry employer who employs a single employee pursuant to a § 8(f) agreement "is entitled to repudiate the agreement by conduct sufficient to put the union and the employee on notice that the agreement has been terminated." *Id.* The court concluded that the company's letter was sufficient to put the union and the only employee on notice that it considered the agreement terminated.

The reasoning in *Operating Engineers* controls here. It would have been futile for Mesa Verde to petition the Board for a representation election with respect to jobs which had not commenced and for which

laborers had not yet been hired. Mesa Verde's conduct had only to be sufficient to put the union on notice that the agreement was terminated. *Id.* at 565. The letter announcing termination was clearly sufficient to do so.

For the reasons stated above, Mesa Verde's motion for summary judgment is granted.

IT IS SO ORDERED.