946 F.2d 527
 138 L.R.R.M. (BNA) 2657, 120 Lab.Cas. P 10,976
 NEW BERLIN GRADING COMPANY, INC., Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
and
International Union of Operating Engineers, Local 139,
AFL-CIO, Intervenor-Respondent,
Cross-Intervenor-Petitioner.
SUNNY SLOPE GRADING, INC., Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
and
International Union of Operating Engineers, Local 139,
AFL-CIO, Intervenor-Respondent,
Cross-Intervenor-Petitioner.
SCHNEIDER EXCAVATING, INC., Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
and
International Union of Operating Engineers, Local 139,
AFL-CIO, Intervenor-Respondent,
Cross-Intervenor-Petitioner.
STOEHR GRADING COMPANY, INC., Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner,
and
International Union of Operating Engineers, Local 139,
AFL-CIO, Intervenor-Respondent.
 Nos. 90-1586, 90-2124, 90-2174, 90-2520, 90-2180, 90-2519,
90-2631 and 90-2862.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 26, 1991.
Decided Oct. 22, 1991.
 
 Anne B. Shindell (argued), Jeffrey N. Gingold, Shindell & Shindell, Milwaukee, Wis., for Stoehr Grading Co., Inc. and Schneider Excavating, Inc.
 Robert N. Herman (argued), Robert C. Truesdale, N.L.R.B., Contempt Litigation Branch, Aileen A. Armstrong, Elliott Moore, Peter D. Winkler, N.L.R.B., Appellate Court, Enforcement Litigation, Washington, D.C., George F. Squillacote, Joseph A. Szabo, Director, Philip E. Bloedorn, N.L.R.B., Region 30, Milwaukee, Wis., for N.L.R.B.
 Warren Kaston (argued), Intern. Union of Operating Engineers, Pewaukee, Wis., for Intern. Union of Operating Engineers, Local No. 139, AFL-CIO.
 Anne B. Shindell (argued), Shindell & Shindell, Milwaukee, Warren Kaston, Intern. Union of Operating Engineers, Pewaukee, Wis., for New Berlin Grading Co., Inc.
 Anne B. Shindell (argued), Shindell & Shindell, Milwaukee, Wis., for Sunny Slope Grading, Inc.
 Before FLAUM, RIPPLE and MANION, Circuit Judges.
 MANION, Circuit Judge.
 
 
 1
 These consolidated cases involve petitions for review by four Wisconsin construction companies (New Berlin Grading Co., Sunny Slope Grading, Schneider Excavating, and Stoehr Grading Co.) of orders by the National Labor Relations Board finding that the companies committed unfair labor practices by refusing to recognize and bargain with the union certified to represent their equipment operators and mechanics. The NLRB has cross-petitioned for enforcement in each case.
 
 I.
 
 2
 The four cases before us all arise from similar facts. (The details--such as the exact number of mechanics and operators at each company, and the precise duties of those employees--differ in each case but the differences are not important.) Each company performs excavating and grading for construction projects throughout Wisconsin. The companies employ heavy equipment operators who perform the grading and excavating, and one or more mechanics who maintain and repair the heavy equipment. (The companies also employ other employees who are not at issue in this case.) The companies all employed far more operators than mechanics.
 
 
 3
 For at least 20 years, each of the companies has been a member of the Wisconsin Excavators and Graders Association (WEGA). As WEGA members, the companies have been parties to what is commonly called a "pre-hire" collective bargaining agreement with the International Union of Operating Engineers pursuant to § 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f) ("the Act"). Section 8(f) allows employers in the building and construction industry to enter into a collective bargaining agreement with a union before the union has attained majority status among the firm's employees. A § 8(f) agreement may also contain union security clauses, exclusive hiring hall provisions, and job referral requirements. See generally International Ass'n of Bridge, Structural and Ornamental Iron Workers v. N.L.R.B., 843 F.2d 770, 772-73 (3d Cir.1988) ("Iron Workers" ), which discusses the history of prehire agreements under § 8(f) and the circumstances in the construction industry that led to § 8(f)'s passage.
 
 
 4
 In accordance with the § 8(f) agreement between WEGA and the union, the companies hired their heavy equipment operators through the union. Thus, the heavy equipment operators were union members when hired or became union members as a condition of employment, and were paid wages and benefits pursuant to the § 8(f) agreement. The mechanics, however, were a different story. Although the § 8(f) agreement included the classification of mechanic, the companies did not hire their mechanics through the union. The mechanics were not union members, and their wages and benefits were different than those of the equipment operators since the § 8(f) agreement was not applied to them.
 
 
 5
 Before 1987, a company was free to repudiate a § 8(f) pre-hire agreement any time before the union represented a majority of the employer's workers. However, if the union at any point during the pre-hire agreement's term acquired the support of a majority of the employees, the agreement was "converted" to a standard collective bargaining agreement governed by § 9(a) of the Act, 29 U.S.C. § 159(a). After conversion, the union enjoyed a presumption of majority status for the term of the agreement, and the employer could no longer repudiate the agreement. See N.L.R.B. v. Pacific Erectors, Inc., 718 F.2d 1459, 1462-63 (9th Cir.1983) ("majority status ... converts a voidable 8(f) agreement into a binding section 9(a) exclusive representation agreement."). In 1987, the Board significantly changed its rules and policies regarding § 8(f) agreements by abolishing the conversion doctrine and holding that a pre-hire agreement is binding on and enforceable by both parties. John Deklewa & Sons, 282 NLRB 1375 (1987). A union seeking the rights of a full-fledged majority union must go through the traditional certification process, which generally means filing a petition for certification and, if necessary, an election. Id. at 1385. A majority vote for the union results in the union's certification as the employees' collective bargaining representative "and the full panoply of Section 9 rights and obligations" that accompany that status. Id. A vote to reject the union voids the § 8(f) agreement and terminates the § 8(f) relationship. Id. The Third Circuit subsequently enforced the Board's decision in Deklewa, and this circuit has also approved that decision. See Iron Workers, 843 F.2d 770 (enforcing Deklewa ); NLRB v. Bufco Corp., 899 F.2d 608 (7th Cir.1990).
 
 
 6
 The Board recognized that its Deklewa decision could spawn numerous election petitions by unions party to § 8(f) agreements. See Deklewa, 282 NLRB at 1386 n. 46. The cases here testify to that prediction's accuracy. After Deklewa, the union sought certification under § 9 as the bargaining representative of each of the companies' employees. In each case, the union sought an election among a bargaining unit consisting of the equipment operators, whom the pre-hire agreement already covered, and the mechanics, whom the pre-hire agreement did not cover. In each case, the company objected to including the mechanics in the unit. The Board held hearings in each case to determine the appropriate unit.
 
 
 7
 The first case the Board decided involved New Berlin Grading Co. After a hearing, the Board's Acting Regional Director determined that the operators and mechanics shared a sufficient community of interest to form an appropriate collective bargaining unit. But the Acting Regional Director also found--based on the facts that the mechanics and operators had different skills, duties, and supervision, and that the pre-hire agreement had never been applied to the mechanics--that the mechanics shared a sufficient separate "community of interest to determine whether they wish[ed] to be added to the unit" including the operators. New Berlin Grading, Inc., No. 30-RE-4915, Acting Regional Director's Decision at 4. Therefore, the Acting Regional Director ordered a "self-determination election" among the mechanics so they could decide whether they wished to be represented by the union along with the operators. Id.
 
 
 8
 Upon the union's request for review, the Board decided that no self-determination election for the mechanics was necessary. The Board agreed with the Acting Regional Director's conclusion that the operators and mechanics shared a sufficient community of interest to be placed in the same bargaining unit. Based on this, the Board concluded that only a single election in the entire unit was appropriate: "When, as here, there is a question of representation in the historical unit and the incumbent union seeks to add a previously unrepresented fringe group whom no other union is seeking to represent on a different basis, the Board will direct only one election, including all employees in the unit found to be appropriate. D.V. Displays, 134 NLRB 568, 571 (1961)." New Berlin, supra, NLRB decision at 2. As cases involving the other companies came up, the Board, based on its decision in New Berlin, directed single elections in the units comprised of operators and mechanics. The union won the elections at all four companies and was certified as the collective bargaining representative of the operators and mechanics at each.
 
 
 9
 Each company subsequently refused to bargain with the union. The union filed unfair labor practice charges against each company and the Board in each case found that the companies' refusal to bargain violated §§ 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) and (1). All of the companies petitioned for review, the Board cross-petitioned for enforcement, and this court consolidated the cases.
 
 II.
 
 10
 The companies do not contest the Board's decision that units consisting of both operators and mechanics are appropriate units. Given that the units were appropriate, the only question before us is whether the mechanics, who had not been union members, were entitled to separate elections to determine whether or not they wanted to be part of those units and be represented by the union.
 
 
 11
 Section 9(c) of the Act, 29 U.S.C. § 159(c), places the authority for conducting representation elections with the Board. When a union files a petition alleging that a "substantial number of employees" wishes to be represented by the union, the Board is to investigate the petition to determine if a "question of representation" exists. 29 U.S.C. § 159(c)(1). If the Board determines that a question of representation exists, then the Board is to conduct an election. Id. However, § 9(c) does not specify how the Board is to conduct the election, other than to say the election is to be by secret ballot. See id. The lack of standards for conducting the elections means the Board has broad discretion to determine the rules controlling elections. See Mosey Mfg. Co. v. N.L.R.B., 701 F.2d 610, 615 (7th Cir.1983). Therefore, we review the election rules the Board formulates only to determine if those rules are reasonable. See id.; Bufco, 899 F.2d at 611.
 
 
 12
 In these cases, the union filed petitions with the Board to be certified as the representative of units including the operators and mechanics. The Board found that questions of representation existed, determined that the units the union sought to represent were appropriate, and ordered elections in the units. Although this is standard Board procedure, the companies contend that the Board should have conducted separate self-determination elections among the mechanics because, in effect, a pre-existing union was attempting to add fringe groups of workers whom the union had never before represented. Generally, when an established union attempts to add new members from among a fringe group of employees the union does not represent, the Board follows a two-step process. First, after the union files its petition and the Board determines a question of representation exists among the fringe group, the Board will determine whether the fringe group and the larger existing unit together form an appropriate unit. See N.L.R.B. v. Southern Indiana Gas & Elec. Co., 853 F.2d 580, 582 (7th Cir.1988). After the Board determines that the unit including both groups is appropriate, the Board will conduct a self-determination election among the fringe employees to determine whether they prefer to be represented by the existing unit or remain unrepresented. Id.
 
 
 13
 The companies argue that the Board should have treated these as cases where an established union was seeking only to add a fringe group of previously unrepresented employees. The companies point to the fact that under the § 8(f) agreement, the union had represented the equipment operators for over 20 years, while never representing (or even seeking to represent) the mechanics. While the operators had never actually voted for the union as their bargaining representative, the operators were union members (as a condition of their employment), and had never sought to have the union removed as their bargaining representative as § 8(f) allows. See 29 U.S.C. § 158(f) (allowing employees to file a petition under § 9(c) asserting that a union does not have majority support). As a practical matter, one could reasonably assert--as the companies do--that the union was so established with the operators that their preference for the union was a foregone conclusion and that the petition to represent a unit including the operators and the mechanics was nothing more than an attempt to force formerly unrepresented members to be added to that established unit. The companies assert that to deny the mechanics a self-determination election under those circumstances trampled upon the mechanics' right to freely choose whether or not to be represented.
 
 
 14
 If the Board had chosen to conduct self-determination elections for the mechanics, that decision would have been reasonable in the circumstances of this case. But the Board instead chose to follow its decision in D.V. Displays, 134 NLRB 568 (1961). In D.V. Displays, several unions which had had contracts covering workers who produced custom displays with firms that manufactured such displays petitioned the Board for an election among the already-covered employees and various other employees at the firms. The petitioned-for unit would include, among others, production employees at one of the firms who did not work on custom displays, photographers, and maintenance workers. Id. at 568-70. In D.V. Displays, the Board found that a unit consisting of all production employees, photographers, and maintenance workers was appropriate, and that a question of representation existed concerning this unit.
 
 
 15
 In D.V. Displays the groups whom the union contracts had not previously covered constituted a fringe group. The Board had previously held that such fringe groups were not to be included in a historical unit "without first ascertaining whether or not they desire to be included." Id. at 571 (citing The Zia Company, 108 NLRB 1184). The Board in D.V. Displays, however, decided to modify the rule calling for a separate election where "there is a question of representation in the historical unit and the incumbent union seeks to add a previously unrepresented fringe group whom no other union is seeking to represent on a different basis...." Id. In such a case, the Board decided that only one election among all the employees in the unit would be appropriate. Id. The Board gave two reasons for adopting the new rule. First, the Board found it more consistent with its statutory responsibility to determine the appropriate unit to direct an election among the entire unit. To do otherwise might perpetuate a fringe defect in the historical unit. Second, the Board found that directing only one election was the more democratic approach because the single election would give all the employees in the unit an equal voice in choosing their bargaining representative. Id. at 571-72.
 
 
 16
 The companies do not challenge the reasonableness of the rule established in D.V. Displays but they do challenge its application to this case. As in D.V. Displays, however, the petitions here represented the first time a question of representation had been presented in the "historical unit." The companies' argument suggests that no real question of representation existed among the operators because of their union membership and longstanding coverage under the § 8(f) agreement. But the operators had to be union members to keep their jobs. The union's support had never before been put to the test in an actual election, and the Board did not have to conclude that the operators' support for the union was a foregone conclusion. There is no hint in D.V. Displays of any dissatisfaction with the union by the employees in the historical unit (the unions having filed the petitions); yet the Board directed only one election in that case for the entire unit.
 
 
 17
 The companies also argue that this case is unlike D.V. Displays because in that case the exclusion of the fringe employees from the historical unit had been an accident. The companies assert no such historical mistake occurred in this case because when the historical unit was formed, none of the companies even employed mechanics; the companies began to hire mechanics only as the companies grew and added their own repair and maintenance departments. The companies also emphasize that the mechanics are hired through different channels, are trained differently, and generally have different skills than the operators.
 
 
 18
 But while all this may be so, the point remains that the Board found that the operators and mechanics properly belonged together in the same unit. The companies do not challenge this finding. It is reasonable to conclude that as in D.V. Displays a fringe defect existed--employees properly included in the unit were not included--and that a self-determination election would perpetuate this defect. Further, it is reasonable to conclude that directing only one election, rather than giving part of the unit what amounts to veto power over whether to be included, is more consistent with the Board's statutory responsibility to determine the appropriate unit.
 
 
 19
 The companies maintain, however, that despite D.V. Displays, the Board has consistently allowed self-determination elections where the union has sought those elections, implying that the Board misapplied or has inconsistently applied its precedent. The companies also assert that this circuit has approved the use of self-determination elections. However, in the cases the companies cite, no question of representation existed in the historical unit. See, e.g., Southern Indiana Gas, 853 F.2d at 582; N.L.R.B. v. American Printers and Lithographers, 820 F.2d 878, 880 (7th Cir.1987); Chrysler Corporation, 173 NLRB 1046 (1968); Duke University, 227 NLRB 1627 (1977). The Board itself has expressly recognized this distinction. See Photype, Inc., 145 NLRB 1268, 1272 & n. 8 (1964). Where a question of representation exists only among the fringe group, it makes little sense to require a unit-wide election. Indeed, the Board has no authority to direct an election where no question of representation exists. See 29 U.S.C. § 159(c)(1). A self-determination election is the only way to allow the fringe employees any say as to their representation.
 
 
 20
 The Board's decision to apply the rule in D.V. Displays and to deny a self-determination election only among the mechanics was a reasonable exercise of its statutory authority to conduct representation elections. That being the case, we deny the companies' petitions for review, and grant the Board's petition to enforce its order.