**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PURNELL'S PRIDE, INC., Respondent.**

No. 78–1566.

United States Court of Appeals, Fifth Circuit.

Jan. 15, 1980.

---

Elliott Moore, Deputy Assoc. Gen. Counsel, William R. Stewart, Edward S. Dorsey, Atty., N. L. R. B., Washington, D. C., for petitioner.

Jolly Miller & Milam, Kenneth E. Milam, Jackson, Miss., James Hugh Ray, Tupelo, Miss., for respondent.

Before COLEMAN, Chief Judge, BROWN and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

The National Labor Relations Board (the Board) petitions for enforcement of its order directing Purnell's Pride, Inc., (the Company or Purnell) to bargain collectively with a labor union that has been certified, following an election conducted by the Board, as the representative of certain Purnell production and maintenance employees. Purnell contends that it has no obligation to bargain with the union because: 1) the production and maintenance employees do not constitute an appropriate bargaining unit; 2) the union engaged in impermissible conduct during the election; and 3) the Board denied due process when it failed to grant Purnell a hearing to consider the election objections. We deny enforcement of the bargaining order because we conclude that the Board has not adequately justified its unit determination.

Purnell is a Mississippi corporation that produces, processes, transports, and sells poultry and other food products. The Company's facilities consist of a hatchery, a feed mill, a processing plant, a by-product plant, a refrigerated warehouse, a dry warehouse, a commercial egg operation, and a maintenance shop. These facilities are not located on a single industrial lot, but are all in or near Tupelo, Mississippi. Purnell's operations are organized into four divisions: the production division, which is responsible for producing the chickens and eggs to be processed and sold by the other divisions; the processing division, which kills, cleans, and packages broiler chickens; the shipping and receiving division, which distributes the products; and the maintenance division, which maintains the Company's vehicles and machinery.

On March 14, 1977, the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO (Union) filed a petition with the Board requesting a representation election in a unit consisting of the production and maintenance employees in Purnell's processing division. At a representation hearing on March 31, 1977, Purnell took the position that the only appropriate unit for the purposes of collective bargaining within the meaning of section 9(b) of the National Labor Relations Act (the Act), 29 U.S.C. § 159(b) (1976), consisted of *all* production and maintenance employees and truckdrivers, excluding certain "agricultural laborers" as defined by section 3(f) of the Fair Labor Standards Act, 29

U.S.C. § 203(f) (1976). On April 18, 1977, the Regional Director issued his Decision and Direction of Election, rejecting Purnell's arguments for the larger unit and ordering an election to be held in a unit composed of the following employees:

> All production employees employed at the Employer's poultry processing plant on Straus Street in Tupelo, Mississippi, including all unloaders, loaders, killers, eviscerators, cutters and packers, and all general maintenance employees employed by the Employer at its Tupelo, Mississippi, facilities, excluding all office clerical employees, local and over-the-road truckdrivers, hatchery employees, commercial egg processing employees, feed mill and by-products plant employees, dry warehouse employees, refrigerated warehouse employees, breeder farm employees, live haul department employees and supervisors as defined in the Act.

Record, vol. II, at 155. At the time of the hearing, this unit embraced approximately 276 employees, whereas the unit proposed by Purnell would have included practically all of Purnell's 488 employees. *Id.*, vol. I, at 9, and vol. II, at 160. The Company requested the Board to review the Regional Director's decision, and the Board denied this request on May 12, 1977, on the ground that the request raised "no substantial issues warranting review." *Id.*, vol. II, at 187.

A secret ballot election was conducted on May 13, 1977, on which date there were 311 eligible voters. The Union won the election by a vote of 200 to 89. In addition, there were 14 challenged ballots and one void ballot. On May 19, 1977, Purnell objected to the Regional Director that the Union and its supporters had made threats, misrepresentations, and racially inflammatory statements that caused the election results not accurately to reflect the views of the unit employees. On June 10, 1977, the Company further alleged that the Union had used forged authorization cards to make the showing of employee interest required before the Board will order an election. The Regional Director investigated these objections and, on June 24, 1977, overruled all of them and certified the Union as the exclusive bargaining representative of the unit. Purnell requested that the Board review this decision and certification, and the Board denied the request on July 28, 1977.

Purnell, contesting the Board's determination, refused to bargain, and the Union filed an unfair labor practice charge. The Board found that the Company's refusal to bargain violated sections 8(a)(1) and (5) of the Act, 29 U.S.C. §§ 158(a)(1), (5) (1976), and issued an order requiring the Company to bargain with the Union. The Board now seeks enforcement of that order.

I

Section 9(a) of the Act provides that the representatives selected "by the majority of the employees in a unit appropriate for such purposes" are to be the "exclusive representatives of all the employees in such unit for the purposes of collective bargaining . . . ." 29 U.S.C. § 159(a) (1976). The Act gives the Board the authority to decide which group of jobs is to constitute the unit. 29 U.S.C. § 159(b). The Board's discretion in making the unit determination is very broad. It is the duty of the Board to select "an" appropriate unit; it need not delimit the *most* appropriate unit. *NLRB v. J. M. Wood Manufacturing Co.*, 466 F.2d 201, 202 (5th Cir. 1972), *cert. denied*, 410 U.S. 931, 93 S.Ct. 1372, 35 L.Ed.2d 593 (1973). Judicial review of the Board's decision is restricted to determining "whether the decision is arbitrary, capricious, an abuse of discretion, or lacking in substantial evidentiary support." *NLRB v. J. C. Penney Co.*, 559 F.2d 373, 375 (5th Cir. 1977).[1] Therefore, an employer who challenges a Board certified unit has the burden of es-

---

1. *See also Packard Motor Car Co. v. NLRB*, 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1967):

   The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion and the decision of the Board, if not final, is rarely to be disturbed.

tablishing "that the designated unit is clearly not appropriate." *Id.* at 375.

The Act offers little guidance to the Board in making unit determinations:

> The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this [Act], the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . .

29 U.S.C. § 159(b). The rights to which section 9(b) refers are apparently those set out in section 7:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities . . . , and shall also have the right to refrain from any or all of such activities . . . .

29 U.S.C. § 157; *see* R. Gorman, Basic Text on Labor Law 68 (1976). The choice of a very large unit with a diversified constituency increases the possibility that there will be conflicts of interests that will undercut the union's ability to represent all unit members effectively. On the other hand, the designation of a small unit that excludes employees with common skills, attitudes, and economic interests may unnecessarily curtail the union's bargaining power and may generate destructive factionalization and in-fighting among employees. *Id.* at 68–69.

The Board and the courts have developed a "community of interest" analysis to guide the Board in selecting viable bargaining units that will effectuate the section 7 policy of employee self-determination. *See, e. g., NLRB v. J. C. Penney Co., Inc.,* 559 F.2d at 375. To decide whether a group of em-

ployees is united by "community of interest," the Board and the courts have looked to "such factors as bargaining history, operational integration, geographic proximity, common supervision, similarity in job function, and degree of employee interchange." *Id.*

These factors have no independent significance. They serve merely to provide a factual basis from which the Board may infer the necessary community of interest; that is, the factors are guidelines that suggest what sort of circumstantial evidence the Board must consider in deciding whether a proposed unit is appropriate. The Board's task is to examine each criterion relevant to the representation proceeding at hand and determine whether evidence bearing on that criterion weighs more heavily for or against a finding of community of interest. Of course, that a proponent of a particular unit has prevailed under one or even several of the criteria may not demand a finding that the unit is an appropriate one. The evidence under the other criteria may weigh so heavily in favor of the opponent of the unit that the whole of the evidence will not support a conclusion that the unit is appropriate. To put it another way, a finding of community of interest, such that the proposed unit is appropriate, is equivalent to a finding that the aggregate of the evidence under all the relevant factors preponderates in favor of the proponent.[2]

This determination demands that the Board do more than simply tally the factors on either side of a proposition. The crucial consideration is the weight or significance, not the number, of factors relevant to a particular case. So as to permit proper judicial review, the Board must assign a relative weight to each of the competing factors it considers. The unit determina-

---

**2.** Reviewing courts have clearly assumed that the Board may not rest a unit determination on *any* indicia of community of interest, but must weigh the totality of the evidence. In *May Department Stores Co. v. NLRB,* 326 U.S. 376, 380, 66 S.Ct. 203, 207, 90 L.Ed. 145 (1945), the Supreme Court upheld the Board's approval of a bargaining unit "since [the] employees had a degree of self-organization and a special trade which *sufficiently* differentiated them from other employees." (Emphasis added.) Of course, to determine the "sufficiency" of the evidence of community of interest the Board must weigh that evidence against all evidence to the contrary.

tion will be upheld only if the Board has indicated clearly how the facts of the case, analyzed in light of the policies underlying the community of interest test, support its appraisal of the significance of each factor. *Cf. NLRB v. Metropolitan Life Insurance Co.*, 380 U.S. 438, 442, 85 S.Ct. 1061, 1063–64, 13 L.Ed.2d 951 (1965) (remanding a unit determination case to the Board since the Board's "lack of articulated reasons for the decisions in and distinctions among these [unit determination] cases" frustrated review).

For example, the distance separating the locations under consideration may be relevant to a unit determination in several ways. Geographic proximity implies a homogeneity of interests among employees. First, the closer together the two job sites, the more likely it is that the two groups of employees work under similar conditions or have contact that may foster common concerns. More importantly, perhaps, proximity suggests that similarly-skilled employees at the two locations are in the same labor market—and are thus potential competitors who would benefit from common representation. The validity of the latter inference depends, of course, on the peculiar facts of the representation proceeding at hand: "[W]hether two locations are in the same labor market depends not only on distance, but also on population density, distribution, and mobility; the availability of highways and mass transportation; and the presence of geographic obstacles." Note, *The Board and Section 9(c)(5): Multilocation and Single-Location Bargaining Units in the Insurance and Retail Industries*, 79 Harv.L.Rev. 811, 832 (1966). On the other hand, the choice of a unit covering a wide geographic area is more likely to include members with diverse working conditions, and the distance between the two locations may hamper

communication between the union and the unit members, undercutting the union's ability to represent unit members effectively in bargaining for and administering a collective bargaining agreement. Of course, the significance of any of these considerations is ultimately a matter of degree. Therefore, although geographic proximity may be an important indicia in unit determination, it cannot bear much weight apart from a determination of whether the two locations in question are in the same labor market and an analysis of any other relevant facts. *See id.*

The operational integration of the employer's business is relevant for some of the same reasons as geographical proximity. Where the processes of production, or of production and distribution, are integrated in a continuous flow system, it is likely that employees from different departments will have to work closely together to coordinate their tasks. A high degree of operational integration suggests that the employer's management structure will be relatively unified, such that both the formulation of personnel policies and the supervision of employees will be directed by a central administrative office. This extensive employee contact and centralized labor policy administration may support an inference that all affected employees have community of interest and belong in a single bargaining unit. The strength of this inference depends, however, on the particular characteristics of the employer's business. As the Board has suggested, the inference is strongest in industries like basic steel, basic aluminum, wet milling, and lumbering, where the employers must use a "continuous flow production system" that depends on exact timing and coordination of employee tasks. *Mallinckrodt Chemical Works*, 162 N.L.R.B. 387, 398 (1966).[3] Less

---

**3.** For example, in *Mallinckrodt*, the Board employed this analysis in ruling that instrument mechanics in a uranium processing plant belonged in a unit with production and maintenance employees:

> The Employer produces uranium metal by means of a highly integrated continuous flow production system . . . .. The process

itself is largely dependent upon the proper functioning of a wide variety of instrument controls which channel the raw materials through the closed-pipe system and regulate the speed of flow of the materials as well as the temperatures within different parts of the system. These controls are an integral part of the production system. The instrument

weight may be assigned to the factor of integration in businesses where the work performed by some of the "integrated" departments could well be subcontracted or where the item produced by a particular department might easily be purchased from an outside supplier.

Similarly, while the extent of the employees' job interchange among facilities operated by the employer may be of crucial importance to unit determination, the significance of the factor depends on a factual context. Employee interchange supports a finding of community of interest among employees at different locations because: (1) the network of contacts and relationships that results from frequent transfers breeds shared interests and the feeling of solidarity; (2) an administrative policy that calls for repeated employee transfers suggests centralized personnel management and indicates a similarity in employee tasks at the various locations; and (3) frequent and extensive employee interchange would make it very difficult for a single location unit to administer rules concerning, for example, pension rights, grievance procedures, overtime, and seniority. *See* Note, *supra*, 79 Harv.L.Rev. at 829. The force of these inferences varies with the nature of the transfers and with the percentage of the employees transferred. The employee interchange factor would appear to demand maximum weight where the employer frequently transfers a large percentage of the employees at a given location to a different location; where the transfers are part of a day-to-day policy rather than temporary measures to meet emergencies or the convenience of particular employees; or where many employees regularly work at two or more locations. *See id.* at 829–30.

The importance of the factual context to the weighing of employee interchange, functional integration, and geographic proximity—like the other community of interest "criteria"—directs the reviewing

court to determine whether the Board has given adequate justification for the weight it has assigned to each factor. Then we must inquire whether the Board acted within its discretion in assessing the preponderance of the circumstantial evidence under *all* of the relevant criteria.

## II

In determining that the poultry processing employees and general maintenance employees constitute an appropriate unit, the Regional Director first made the following findings of fact:

There is no history of collective bargaining at any of the Employer's Tupelo facilities.

[A]ll job applicants are interviewed, and all new employees are hired, through the Employer's central personnel office. A standard application form is issued to all applicants, and all personnel files are maintained at the central personnel office. There is a single payroll and all paychecks are issued through a bank computer. The labor relations policies are established jointly by officers of the Company and the heads of [the] four departments . . . . All new employees, for the first 3 months of employment . . . all receive the same rate of pay . . . . All employees are eligible to receive pay increases based upon longevity and merit . . . . They all . . . punch time clocks located in their individual work areas. During 1976, 20 employees were transferred from one department to another. Among these were 3 employees who, because of their familiarity with certain plant equipment, were transferred from the eviscerating department of the processing plant to general maintenance.

The poultry processing plant . . . is geographically separated from all of the Employer's remaining facilities. . .

mechanics' work on such controls is therefore intimately related to the production process itself. Indeed, in performing such work, they must do so in tandem with the operators of the controls . . . . .

162 N.L.R.B. at 398–99. Although we approve of the Board's analysis of the integration factor in *Mallinckrodt*, we intimate no opinion concerning the Board's weighing of the totality of the factors.

[T]he production functions performed inside the poultry processing plant, i. e., killing, eviscerating, cutting and packing are not performed at the Employer's other facilities.

There are approximately 35 general maintenance employees who are engaged in the maintenance and repair of plant equipment. [M]ost of these employees report to the poultry processing plant. . . . [T]hey perform work at all facilities of the Employer.

Sixteen employees are assigned to the vehicle maintenance shop where they spend most of their working time engaged in the maintenance and repair of company vehicles. General maintenance employees perform their work under the supervision of Maintenance Supervisor *Raymond Davis,* and vehicle maintenance employees work under the supervision of Maintenance Supervisor *Wayne West.*

Record, vol. II, at 156.

Next, the Regional Director briefly described the operations of Purnell's other facilities. He pointed out that the "live haul crews" have "no daily routine contact with production and maintenance employees assigned to the poultry processing plant" and that each live haul crew chief has the authority to hire and fire members of his crew. *Id.* at 157. He then noted that the compensation of Purnell's truckdrivers is calculated in a manner different from the compensation of other employees and that there is no evidence of interchange between drivers and the general maintenance employees or the production employees at the processing facility. *Id.*

The Regional Director analyzed these evidentiary facts as follows:

The Employer contends that the degree of product integration, the centralized control of labor relations policy and the degree of uniformity in employee benefits warrant the conclusion that only its proposed multilocation unit is appropriate.

The Board has held, however, that a single plant unit is presumptively appropriate where there is no bargaining history in a more comprehensive unit and no functional integration with operations of other facilities sufficient to obliterate separate plant identity. *Haag Drug Company, Inc.,* 169 NLRB 877. In my view, the centralized control of employee relations and the product integration reflected in the record herein are not sufficient to alter the separate identity of the employees who perform their work at the poultry processing plant on Straus Street. In reaching this conclusion, I have considered the lack of bargaining history, the separate location of the plant sought, the lack of substantial employee interchange and the fact that no other labor organizations seek to represent the Employer's employees. I find, therefore, that a unit restricted to production employees at the poultry processing plant and all general maintenance employees constitutes an appropriate unit. *Maryland Cup Corporation,* 171 NLRB 367, 368.

Inasmuch as the general maintenance employees all share the same supervision, and perform similar work functions, and in view of the uncontradicted testimony of Geyton that they perform work at all facilities, including the poultry processing plant, I shall include all general maintenance employees in the unit. . . .

Inasmuch as the over-the-road drivers and local drivers assigned to the shipping and receiving department are compensated on different bases than employees engaged in production and maintenance functions, and work under different supervision, and in view of the lack of employee interchange between the drivers and those employees included in the unit, I shall exclude the over-the-road and local drivers from the unit. *E. H. Koester Bakery Co.,* 136 NLRB 1006. In view of the different work functions, the lack of common supervision and the lack of interchange, I also find that the employees employed in the vehicle maintenance shop on Westmoreland lack a sufficient community of interest with unit employees to warrant their inclusion. I shall, therefore, also exclude them from the unit. *E. H. Koester Bakery Co., supra.*

I further find, based on the foregoing, that members of the live haul crews lack a sufficient community of interest with production and maintenance employees to warrant their inclusion. In making this finding, I have taken in consideration the lack of common supervision, the lack of employee interchange and the apparent minimal amount of contact between the crew members and production and maintenance employees.

*Id.* at 157–58.

This analysis indicates that the Regional Director and the Board, which upheld his ruling, concluded that evidence bearing on bargaining history, geographic proximity, employee interchange, and common job function supported approval of the proposed unit while evidence concerning operational integration, common supervision, and uniformity of employee benefits militated against the proposed unit. The factors favoring the unit appeared to the Regional Director and the Board to outweigh the counterfactors.

The above analysis does not adequately explain, however, the weight that has been assigned to each individual factor. For example, the decision does not articulate why, in the context of the particular business, the transfer of twenty employees from one department to another is so insubstantial as to tell in favor of the unit; why the degree of departmental supervision outweighs central determination of labor policies and plant-wide hire, dismissal, and compensation; why the separate location of the processing plant has such significance when all of the facilities are in the same general area; or why the uniqueness of the job functions at the processing plant is important where employees in all departments are generally "unskilled." Similarly, there is no explanation of why the sort of "product integration" present here does not lead to the certification of a larger unit.

Nor does the Regional Director's analysis sufficiently justify the conclusion that the totality of the factors suggesting community of interest preponderates over the opposing criteria. Instead of explaining exactly why the overall evidence favoring a plant-wide unit is, in the context of the immediate facts, less significant than opposing evidence, the Regional Director rests the unit determination primarily on a "presumption" that a single plant unit is appropriate. In our view, this presumption does not contribute one whit to the analysis.

A presumption is a procedural device "under which certain facts are held to call for uniform treatment with respect to their effect as proof of other facts." McCormick, *Evidence* § 342, at 803 (2d ed. 1972). The Board's single plant presumption appears to have been designed to require a ruling that the employees within a proposed unit have community of interest such that the unit is "appropriate" whenever the finder of fact first concludes that the proposed unit is a "plant." Theoretically, the effect of the presumption is to obviate the need to examine any of the criteria that provide circumstantial evidence of community of interest once the primary fact—that the facility in question is a plant—has been established.

This procedural device is based on the notions that where an employer's facility is a "plant," certain indicia of community of interest will be present, and that those factors are of such importance that they will inevitably outweigh the aggregate of any counterfactors. There appear to be three crucial factors favoring approval of a facility as a unit where that facility is a plant. A "plant" would not be geographically proximate to any of the employer's other facilities; there would be very little employee interchange between the facility and any other facility; and day-to-day management of the facility would be predominately internal. *See* R. Gorman, Basic Text on Labor Law 78 (1976).

Even if the theoretical basis of the single plant presumption is sound, we believe it is bound to prove almost useless in practice. The presumption does not operate unless the finder of fact first determines that the facility in question is a "plant." To prove this primary fact, the union advocating the unit would have to introduce evidence of the three crucial factors. Of course, the

opponent would counter with evidence to the contrary; in the instant case, for example, Purnell argued that the Company's operations are so integrated and the facilities are located so close together that it is not meaningful to view the processing facility as a "plant" for purposes of a unit determination. *See* Brief for Purnell at 25. The next step is for the trier to decide which party's evidence preponderates. If the inferential basis of the presumption is sound, however, a finding whether or not the factors of geographic proximity, employee interchange, and managerial independence support the proposed unit would almost certainly outweigh any remaining relevant factors. Since the trier would have to consider the same factors to decide whether the processing facility is a "plant" as to determine, in the absence of any presumption, whether the employees embraced by the proposed unit have "community of interest," the presumption does nothing but confuse the inquiry.[4]

Even if we could accept the conclusory statement that the processing facility is a "plant," the Regional Director's analysis is insufficient because it fails to explore the possibility that the proposed unit falls within the exception that the Regional Director says exists when there is "functional integration with operations of other facilities sufficient to obliterate separate plant identity." Record, vol. II, at 157; *see also Haag Drug Company, Inc.,* 169 N.L.R.B. 877

(1968). Rather, the Regional Director, without discussion, simply made the finding that "the centralized control of employee relations and . . . product integration . . . are not sufficient to alter the separate identity" of the processing employees. Record, vol. II, at 157. The critical question, which the Director and the Board have ignored, is *why* these factors are not sufficient to deflate the presumption that the processing employees have a "separate identity."

While the Board enjoys broad discretion in designating bargaining units, "[w]hen the Board so exercises the discretion given to it by Congress, it must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.'" *NLRB v. Metropolitan Life Insurance Company,* 380 U.S. 438, 443, 85 S.Ct. 1061, 1064, 13 L.Ed.2d 951 (1965).[5] *See Amalgamated Clothing Workers of America, AFL–CIO v. NLRB,* 491 F.2d 595, 597 (5th Cir. 1974).

In the instant case, the reasons supporting the Decision and Direction of Election are not sufficiently articulated to permit proper judicial review. In approving the Regional Director's unit determination without providing additional, adequate reasons for its decision, the Board failed to meet its obligation to "disclose the basis of its order." Consequently, we decline to enforce the bargaining order against Purnell

---

4. The Board has founded the single plant presumption not only on the strength of the inference that employees have community of interest when they work in a single plant, but also on its reading of section 9(b) of the NLRA. Section 9(b) says: "The Board shall decide in each case whether . . . the unit . . . shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . ." The Board appears to think that this language provides sufficient justification for the presumption: "A single-plant unit, being one of the unit types listed in the statute as appropriate for bargaining purposes, is presumptively appropriate." *Dixie Belle Mills, Inc.,* 139 N.L.R.B. 629, 631 (1962) (footnotes omitted). We consider this statutory premise inadequate. Section 9(b) mentions craft units and employer units as well, but the Board has not employed similar presumptions when it has considered

these units. Note, *supra,* 79 Harv.L.Rev. at 826.

5. The Supreme Court, in *Metropolitan Life,* did not rule out the possibility that the Board may rely on rules of thumb and precedential decisions in making unit determinations:

"Of course, the Board may articulate the basis of its order by reference to other decisions or its general policies laid down in its rules and its annual reports, reflecting its 'cumulative experience,' so long as the basis of the Board's action, in whatever manner the Board chooses to formulate it, meets the criteria for judicial review."

380 U.S. at 443 n.6, 85 S.Ct. at 1064. (citations omitted). In the case at hand, for the reasons set out in the text, the "single plant presumption" does not meet the "criteria for judicial review."

and remand the case to the Board for further proceedings consistent with this opinion.

Because of our disposition of the unit determination issue, we find it unnecessary to address at this time Purnell's objections to the representation election.

ENFORCEMENT DENIED AND CASE REMANDED WITH INSTRUCTIONS.