United States Court of Appeals,

Fifth Circuit.

Nos. 91–4106, 91–4249 and 91–4268.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

CATALYTIC INDUSTRIAL MAINTENANCE CO. (CIMCO), Respondent.

July 6, 1992.

Application for Enforcement of Orders of the National Labor Relations Board.

Before WISDOM, REYNALDO G. GARZA, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In the first two cases in this consolidated appeal, the National Labor Relations Board (the Board) seeks to enforce its orders requiring Catalytic Industrial Maintenance Co. (CIMCO) to bargain collectively with the Board-certified representative of skilled electricians at two facilities—one owned by Sterling Chemical (Case No. 91–4106), the other by Union Carbide (No. 91–4268)—where CIMCO had contracted to perform industrial maintenance and refurbishing services. In the third case (No. 91–4249), the Board asks us to enforce its finding that CIMCO committed unfair labor practices when, following the election at the Sterling Chemical plant, it terminated electricians referred by the newly certified bargaining unit.

We hold that the Board's decisions in all three cases are supported by law and by substantial evidence. Accordingly, we enforce the Board's orders requiring CIMCO to bargain collectively at the Union Carbide and Sterling Chemical facilities, as well as its order directing CIMCO to remedy violations of the protected rights of electricians at the Sterling Chemical site.

I.

BACKGROUND

CIMCO, a corporation with its principal place of business in Pennsylvania, supplies contract

maintenance and refurbishing services to nuclear, chemical and industrial facilities throughout the United States. Sterling Chemical and Union Carbide retained CIMCO to perform maintenance services at their plants in Texas City, Texas. CIMCO employs an all-union workforce at these two facilities, including workers from a number of trade crafts. In 1956, CIMCO and other owners of continuous maintenance businesses negotiated a nationwide collective bargaining agreement with more than a dozen international building trades unions. That agreement is known as the General Presidents' Project Maintenance Agreement (GPA) and is administered by the General Presidents' Council (GPC), a standing committee of representatives from the international unions. When an individual contractor wants to employ skilled workers under a GPA at a particular site, it applies to the GPA administrator, who is employed and supervised by the GPC. Once executed, the GPA governs the terms and conditions of employment for the various crafts at that site. The parties to the GPA are the individual contractor, in this case CIMCO, and the individual international unions that comprise the building construction trades department of the AFL–CIO, including the International Brotherhood of Electrical Workers (IBEW). Local union affiliates are not parties to the GPA. Notably, the parties in this case have stipulated that the GPA is a "pre-hire" agreement governed by § 8(f) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(f).[1]

---

[1]Section 8(f) provides in relevant part:

> It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement ... *Provided further,* That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.

A pre-hire agreement allows employers to recognize and enter into collective-bargaining agreements with a construction industry union before any employees have been hired. Employers are therefore authorized to negotiate, adopt and implement collective-bargaining agreements even when the union's actual majority status has not been determined as would otherwise be required by § 9(a). *See John Deklewa & Sons,* 282 NLRB 1375, 1380–81 (1987), *enf'd sub. nom., Internat'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Local 3 v. NLRB,* 843 F.2d 770 (3rd Cir.1988), *cert. denied,*

In January, 1987, CIMCO applied for and was granted a GPA to cover union employment for supplemental maintenance services at the Sterling Chemical facility. In 1989, CIMCO also applied for a GPA at the Union Carbide plant, but the parties disagree as to whether this GPA was approved. CIMCO contends that it was notified on August 29, 1989 that the GPC had granted its request for a GPA at Union Carbide. The Board, however, concluded that the IBEW never participated in the GPA at that facility. In either event, on August 30, 1989, the IBEW notified CIMCO by letter that it was withdrawing from participation in the GPA at both the Sterling Chemical and Union Carbide plants.[2] After the IBEW notified CIMCO that it was withdrawing from participation in the GPA at the Sterling Chemical site, Local 527 filed a petition for a certification election pursuant to § 9(c) of the Act. Local 527 sought to be certified as the representative unit of all "journeymen electricians, instrument technicians, and apprentices working for CIMCO at its job site at Sterling Chemicals, Texas City, Texas." On June 8, 1990, the NLRB regional director found that the proposed electricians' unit was entitled to severance from the multi-craft unit. Accordingly, he directed an election. The majority of electricians at the Sterling Chemical site voted for representation by Local 527, which was then certified as their bargaining representative. CIMCO refused to bargain with Local 527, and the Board's finding that CIMCO had violated §§ 8(a)(1) and (5) of the Act led to the enforcement action in No. 91–4106.[3]

---

488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 213 (1988).

[2]The IBEW withdrew from the GPA at these two sites at the request of its local union affiliate, Local Union 527 (Local 527), evidently because the GPA provided that electricians at these facilities would be paid at only 90% of the prevailing area wage. The implications of the IBEW's withdrawal from the GPA are discussed more fully below. The IBEW continues to participate in nationwide administration of the GPA and apparently has not withdrawn from other GPA-operated facilities.

[3]CIMCO insists that the IBEW's withdrawal from a particular site covered by the GPA was not only improper, but threatened to jeopardize its relations with other international building trades unions at more than 40 other GPA-covered sites across the country. CIMCO's labor relations manager testified that the IBEW's withdrawal from the GPA at the Sterling Chemical facility was "unprecedented," and he and other CIMCO officials expressed their belief that Local 527 electricians would no longer man the job site once the IBEW's withdrawal took effect on January 1, 1991. In disagreeing with this assessment, the Board cited other evidence in the record suggesting that CIMCO was in fact aware that Local 527 would continue to man the Sterling Chemical plant even after the GPA expired.

More than six months after Local 527 filed its petition for an election at the Sterling Chemical site, Local 527 also sought certification of a similar unit at the Union Carbide facility. The NLRB regional director issued a substantially identical ruling and a certification election was held at that site on November 7. Once again, a majority voted in favor of representation by Local 527, and it was certified as the bargaining representative. CIMCO's refusal to bargain with Local 527 in its pursuit of a collective-bargaining agreement at Union Carbide, and the Board's finding that CIMCO had engaged in unfair labor practices, triggered the enforcement action in 91–4268. The terms of the GPA mandate that all skilled craft positions at the GPA-covered facility be filled by union members. In the course of negotiations with Local 527, CIMCO stated that it would be forced to hire electricians from a source other than the Union's hiring hall should the IBEW conclusively withdraw from the GPA. Local 527 responded that it would picket the Union Carbide facility and, despite CIMCO's request, it refused to refer electricians from its hiring hall to staff that site. CIMCO then hired electricians responding to newspaper advertisements, and Local 527 engaged in the threatened picket, which disrupted operations at the Union Carbide plant.

As the deadline approached for the IBEW's withdrawal from participation at the Sterling Chemical GPA, CIMCO and Local 527, along with national union officials, tried unsuccessfully to negotiate a compromise.[4] CIMCO strenuously disagrees with the Board's finding that CIMCO was aware at the time of these negotiations of Local 527's plans to continue to refer electricians to the Sterling Chemical site even after the IBEW had withdrawn from the GPA. CIMCO officials testified that they believed Local 527 would no longer refer any electricians to the Sterling Chemical site, prompting CIMCO to advertise in local newspapers and to make gate hires. CIMCO took the position at the time that hiring "non-union electricians"—even if they belonged to Local 527—would violate the provision of the GPA requiring that all trade positions be held by union members. Accordingly, on December 29, 1990, the last day before the IBEW-scheduled withdrawal from the

___

[4]At one point, CIMCO officials traveled to Washington, D.C., where IBEW officials explained the international union's policy that it would not require any local union affiliate to work under the GPA at a given site for less than 100% of the prevailing area wage if the local chose not to do so.

GPA, CIMCO notified all electricians at the Sterling site that they had "voluntarily quit" their employment with CIMCO by virtue of the IBEW's withdrawal from the GPA. Several electricians protested that they were not voluntarily resigning and wished to remain on the workforce. Nonetheless, all 34 electricians at the Sterling Chemical site were terminated on that date. CIMCO had earlier invited these same electricians to submit resumes to work at the Sterling Chemical facility for CIMCO on a non-union basis once the IBEW had withdrawn from the GPA, and by the end of January, eight Local 527 members had been rehired as non-union employees.

In its complaint to the NLRB, Local 527 asserted that the electricians were terminated because they had been referred by its hiring hall and accused CIMCO of trying to pressure the IBEW to remain in the GPA at the Sterling site. The NLRB regional director then issued a complaint that CIMCO had violated §§ 8(a)(1) and (3) of the Act by terminating the Sterling Chemical site electricians. After a hearing, an administrative law judge agreed. The Board affirmed, adopted the ALJ's decision, and filed an application for enforcement with this court which, together with the Board's petitions to enforce its bargaining orders stemming from the elections at the Union Carbide and Sterling Chemical facilities, form the basis of this appeal.

## II.

### PROCEDURAL BAR

Before proceeding to the merits of the Board's decisions, it is necessary to address a procedural question that is limited to No. 91–4268, the Board's decision ordering CIMCO to bargain with Local 527 at the Union Carbide facility. Because CIMCO did not file a separate request for review of the order in the Union Carbide decision, the Board insists that CIMCO has waived its right to appeal that order in this court. So confident is the Board of its correctness that its brief fails to address any of CIMCO's legal arguments in No. 91–4268, despite a previous order by a panel of this court to do so.

We emphatically reject the Board's claim that CIMCO is procedurally barred from appealing the Union Carbide case. As CIMCO rightly observes, both election decisions involve the same employer, the same petitioner, and virtually identical factual issues; indeed, the parties stipulated that the factual record in the Sterling Chemical election case (No. 91–4106) applies here. The stipulated record includes *all* record entries, including CIMCO's request for review. *See* 29 C.F.R. § 102.68 (1990) (defining record on review as including "the petition, notice of hearing with affidavit of service thereof, motions ... stipulations, exhibits ... and any briefs or other legal memoranda submitted by the parties to the regional director of the Board, and the decision of the regional director, if any"). Based on this authority, the panel denied t he Board's motion for summary enforcement and ordered the Board to proceed with briefing—an order that the Board has defied.

Although the Board's arguments would likely be identical to those advanced in No. 91–4106, that does not excuse its failure to comply with the court's request that the substantive legal issues in No. 91–4268 be briefed. Because the record is broadly defined by regulation, because this court has previously denied summary enforcement, and because both parties have treated the two election cases as proceeding jointly, CIMCO is not procedurally barred from appealing the Board's order in the Union Carbide case.

## III.

## CERTIFYING THE ELECTIONS

Moving to the merits, our first task is to decide whether CIMCO violated §§ 8(a)(1) and (5) of the Act by refusing to bargain with Local 527 at the Union Carbide and Sterling Chemical facilities. The answer necessarily turns on whether the Board properly certified a separate bargaining unit for skilled electricians carved out from the pre-existing multi-craft unit mandated by the GPA. We are mindful that § 9(b) of the Act confers broad authority and discretion upon the Board to determine

appropriate bargaining units. *NLRB v. DMR Corp.,* 699 F.2d 788, 791 (5th Cir.1983).[5] The Board's decision must stand unless it is "arbitrary, capricious, an abuse of discretion, or lacking in substantial evidentiary support." *NLRB v. J.C. Penney Co., Inc.,* 559 F.2d 373, 375 (5th Cir.1977).

In determining the appropriateness of the bargaining unit, the Board applies a "community of interests test" that weighs a range of factors in evaluating the commonality of interest between the workers and the proposed units. *DMR Corp.,* 699 F.2d at 791. As this court has explained:

> Whether employees have a community of interests is determined by looking at such factors as: similarity in the scale and manner of determining earnings; similarity in employment benefits, hours of work and other terms and conditions of employment; similarity in the kind of work performed; similarity in the qualifications, skills and training of employees; frequency of contact or interchange among employees; geographic proximity; continuity or integration of production processes; common supervision and determination of labor-relations policy; relationship to the administrative organization of the employer; history of collective bargaining; desires of the affected employees; and extent of union organization.

*Id.* (citing *NLRB v. Purnell's Pride, Inc.,* 609 F.2d 1153, 1155 (5th Cir.1980)). The community of interests test recognizes that "[t]he most reliable indicium of common interest among employees is similarity of their work, skills, qualifications, duties and working conditions." *DMR Corp.,* 699 F.2d at 792. To analyze the Board's application of the test, this court need not ascertain whether *every* factor has been satisfied; "[t]he crucial consideration is the weight or significance, not the number, of factors relevant to a particular case." *Purnell's Pride,* 609 F.2d at 1156. Thus, the Board's decision must indicate "how the facts of the case, analyzed in light of the policies underlying the community of interests test, support its appraisal of the significance of each factor." *Id.* at 1157. The court's review is limited to the facts and conclusions found in the Board's decisions. Post-hoc justifications are not to be considered. *NLRB v. Pioneer Natural Gas Co.,* 397 F.2d 573, 576 (5th

---

[5]Section 9(b) provides:

> [T]he Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof....

29 U.S.C. § 159(b).

Cir.1968).

Both parties argue that the facts unequivocally support their respective positions regarding the propriety of carving out the electricians' unit from the multi-craft collective-bargaining group. CIMCO argues that the electricians' daily tasks are inextricably correlated with other skilled craft tasks. Buttressing this assertion is the fact that approximately 90% of CIMCO's maintenance projects at the Union Carbide and Sterling Chemical plants require input from several different crafts. CIMCO also emphasizes the extensive collective bargaining history of the GPA. The Board counters that the relevant bargaining history should be limited to that of the electricians working at a particular site. Thus, for instance, prior to January 1987, all contract maintenance electricians at the Sterling Chemical plant belonged to Local 527 and were represented by it. The Board also ascribes critical importance to the fact that the electricians had separate locker and tool room facilities, and were provided with a separate fleet of vehicles for their maintenance tasks. Moreover, the electricians were apparently the only trade craft employees to identify themselves with chartreuse-colored dots on their helmets.

On balance, we cannot say that the Board erred in finding that the community of interests test warranted severance of Local 527 from the multi-craft units at the Sterling Chemical and Union Carbide plants. Contrary to the Board's position before our court, the ALJ based this determination on *Mallinckrodt Chemical Works,* 162 NLRB 387 (1966), which established six non-exclusive factors for craft severance determinations. The *Mallinckrodt* factors concentrate on the bargaining unit's history and community of interests, as well as the nature of the employer's operations. *Id.* at 396 n. 83. *Mallinckrodt* addressed an election petition in which certain instrument mechanics desired separate representation at a highly integrated uranium processing facility, as opposed to a maintenance contractor serving the construction industry. The *Mallinckrodt* factors typically apply in a situation where a single employer operates a "wall-to-wall" manufacturing or processing facility, and where the respective trade craft employees' own interests have been largely submerged in the

broader community of interests shared by all plant employees. *See, e.g., The Bendix Corp.,* 227 NLRB 1534, 1535–40 (1977); *Dow Chemical Co.,* 202 NLRB 17, 17–20 (1973); and *ASG Industries,* 190 NLRB 557, 558 (1971). According to one hornbook,

> The cases and the commentators have indicated that the *Mallinckrodt* standard usually results in a denial of craft severance....
>
> The Board's reluctance to disrupt an established stable bargaining relationship will generally prevail over a claim that a separate craft unit is entitled to different representation. [footnotes omitted].

C. Morris, The Developing Labor Law 430–31 (1983).

*Mallinckrodt* governs this case, but the way in which its 6–factor test applies is hotly disputed. CIMCO urges us to focus on the integrated nature of the maintenance operations that it performs, likening them to a single plant's wall-to-wall operations. CIMCO contends that in the 30–year history of the GPA, these are the only cases in which a union has withdrawn from the GPA at particular sites and thus attacked the necessary uniformity and stability of bargaining at those sites. If IBEW's carve-out from the GPA is permitted to prevail here, CIMCO fears, the inter-craft harmony on which it relies is jeopardized, the future of the GPA threatened, and ultimately, union contractors' competitive abilities against non-unionized contractors are drawn into question.

The Board, generally ignoring the larger issues painted by CIMCO, applied *Mallinckrodt* solely from the perspective of the separate bargaining history of electricians at the Sterling Chemical site. In this setting, CIMCO is but one component of the operations at Sterling Chemical and Union Carbide. Unlike *Mallinckrodt,* CIMCO electricians are not part of an integrated production process, for the relevant operations at Sterling Chemical involve not one but four separate building trades workforces. The electricians at Sterling Chemical had a history of distinct representation. Moreover, given the IBEW's withdrawal from the GPA, denying certification at these sites would apparently leave the electricians unrepresented. No union has expressed interest in representing the employees in a multi-craft unit of the sort in which CIMCO insists they be included.

Although we understand and might sympathize with CIMCO's plight, three points render its position unpersuasive. First, despite an eloquent oral argument depicting the instability that may follow the Board's craft-severance decision here, there is no record evidence to support CIMCO's fears. Second, despite the Board's tendency following *Mallinckrodt* to deny craft severance petitions and to prefer historically stable bargaining relationships, the fact-intensive test is flexible and amenable to the position the Board adopted here. The Board did not misapply *Mallinckrodt,* even though we might disagree with its result, nor are the findings perceived relevant by the Board so out of line with *Mallinckrodt* as to be arbitrary and capricious. Third, the application of *Mallinckrodt* generally to deny craft severance petitions in the construction industry may be problematic following *Deklewa* 's rejection, discussed below, of the conversion doctrine. CIMCO did not argue this point, however, and we are unwilling to gainsay the Board's implicit resolution of it in this case.

CIMCO next invokes the Board's decision in *Deklewa* to justify the company's refusal to bargain with Local 527. As we have already noted, the parties have stipulated that the GPA was a § 8(f) pre-hire agreement. *Deklewa* proclaimed a major shift in Board policy on § 8(f) issues. That decision's most significant holding, not directly applicable here, is that pre-hire agreements may not be unilaterally repudiated unless the employees vote to decertify or to change their collective-bargaining representative. 282 NLRB at 1381. The Board ruled in *Deklewa* that the company, part of a multi-employer association, violated §§ 8(a)(1) and (5) of the Act by withdrawing recognition from a local union affiliate during the term of a pre-hire agreement. Thus, when the employer voluntarily entered into a § 8(f) relationship with the union, the resulting contract was binding, enforceable, and not subject to unilateral repudiation by the employer. *Id.* at 1389.[6] More important to this case, *Deklewa* abandoned the "conversion doctrine," which permitted a § 8(f) prehire agreement to "convert" into a § 9(a) agreement by means other than a Board election or

---

[6]Nevertheless, the employer was not compelled to negotiate or adopt a successor agreement with the union based solely on the existence of the § 8(f) relationship because by the time the Board considered the case, the contract had expired, and the union no longer enjoyed a presumption of majority status. *Id.*

voluntary recognition.[7] By rejecting the conversion doctrine, *Deklewa* allows the pursuit of a representation petition by a union during the term of a § 8(f) pre-hire agreement. However, the Board also stated that in processing § 9(a) petitions, "the appropriate unit normally will be the single employer's employees covered by the agreement." *Id.* at 1377.[8]

CIMCO pins great hopes on the Board's pronouncement that a collective-bargaining unit normally should be contiguous with the § 8(f) pre-hire unit. The Board responds that this principle of *Deklewa* is inapposite in this case, arguing that *Deklewa* was addressing unit "scope" determination in situations where there are numerous physically segregated construction projects and a distinction had arisen between workforces that are permanent and stable, as opposed to those that serve on a project-by-project basis. While the government's point is well taken, the text of *Deklewa,* which reflects the Board's willingness to undertake a more general revision of its policy regarding § 8(f) pre-hire agreements, precludes such a crabbed reading. *See, e.g.,* 282 NLRB at 1382–84.[9] More accurate is the Board's argument that, after *Deklewa,* the different workforces covered by the GPA do not necessarily qualify as a single "appropriate unit" for purposes of § 9(b). Consequently, it is difficult to overrule the NLRB regional director's finding that "[t]he unit sought by [Local 527] is the unit of employees historically represented by [Local 527] both as a participant in the General Presidents' Agreement and individually."[10] Even under the GPA, moreover, the electricians were

---

[7]*See R.J. Smith Construction Co.,* 191 NLRB 693 (1971), *enf. denied sub nom., Operating Engineers Local 150 v. NLRB,* 480 F.2d 1186 (D.C.Cir.1973); and *Ruttmann Construction Co.,* 191 NLRB 791 (1971).

[8]The Board further explained that the "merger" doctrine in which employees of a single employer "may normally be added into a multi-employer bargaining unit," will normally not apply to union determinations in such cases. *Id.*

[9]The Board stated: "In determining the appropriate unit for election purposes the Board will no longer distinguish between "permanent and stable' and "project by project' work forces...." 282 NLRB 1385.

[10]By this language, we do not infer, as does CIMCO, that the Board misunderstood that IBEW, *not* the local, is the party to the GPA. Rather, we interpret the Board as referring functionally to the interests of the electricians through representation of the Local 527 and IBEW. Consistent with this interpretation is the Board's observation that even before Sterling Chemical acquired its Texas City plant from Monsanto in 1986, Local 527 represented electricians at that

separately identified from other trade crafts at the international union level because the IBEW was one of the GPA's signatory members. Thus, even assuming this court were to adopt *Deklewa,* a question we have not yet squarely resolved in this circuit,[11] we are not convinced that the GPA *must* qualify as the appropriate unit for electricians in this case. Based on the record, the Board reasonably could—and did—conclude otherwise.[12]

Having sought to avail itself of the benefits of *Deklewa,* CIMCO next argues in the alternative that *Deklewa* is *not* binding precedent in this circuit. Specifically, CIMCO contends that the conversion doctrine, under which the § 8(f) pre-hire GPA could be automatically converted into a § 9(a) collective bargaining agreement upon a showing of the union's majority status, should apply in this case. We agree with the Board that CIMCO has failed to preserve this issue on appeal. Appellate preservation principles apply equally to petitions for enforcement or review of NLRB decisions. *Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665–66, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982). In the proceedings before the Board, CIMCO did not take issue with *Deklewa* and in fact rejected the conversion doctrine on which it now seeks to rely. Having failed to invoke this defense when the case was before the Board, CIMCO is foreclosed from raising it for the first time here.

---

facility. From 1940 to 1986, the Local 527 electricians worked for several maintenance contractors at the Sterling site but retained the same bargaining unit.

[11]Although *Deklewa* was enforced by the Third Circuit and certiorari was denied by the Supreme Court, the Fifth Circuit has not conclusively adopted or rejected *Deklewa* 's holding. In *United Brotherhood of Carpenters & Joiners Local Union 953 v. Mar–Len of Louisiana, Inc.,* 906 F.2d 200, 203 n. 2 (5th Cir.1990), the panel assumed *arguendo* that *Deklewa* would apply as controlling law in this circuit but expressly reserved the issue for another day. Because neither CIMCO nor the Board has briefed or argued the issue, we decline to decide it here.

[12]While no circuit has specifically rejected *Deklewa,* some courts have declined to apply it retroactively. *See, e.g., Construction Industry Welfare Fund of Rockford, Illinois v. Jones,* 672 F.Supp. 291 (N.D.Ill.1987); *Mesa Verde Construction Co. v. Northern Cal. Dist. Council of Laborers,* 598 F.Supp. 1092 (N.D.Cal.1984), *aff'd,* 820 F.2d 1006 (9th Cir.1987), *remanded en banc,* 861 F.2d 1124 (9th Cir.1988), *cert. denied,* —— U.S. ——, 111 S.Ct. 209, 112 L.Ed.2d 169 (1990).

Finally, CIMCO insists that the IBEW did not effectively withdraw from the GPA, although the company has not explained what would constitute an effective withdrawal. In a letter dated August 30, 1989, the President of the IBEW notified both CIMCO and the GPA Administrator that, effective on December 31st of that year, the International was terminating "its participation in the (GPA) presently in effect at the Sterling Chemical Facility located at Texas City, Texas." A similar notice declaring the IBEW's withdrawal from the GPA at Union Carbide was received by CIMCO on August 31, 1989. There is no indication that these letters failed to provide CIMCO adequate notice of the IBEW's withdrawals from the GPAs at these sites. Letter notification has been held to be sufficient notice of repudiation of § 8(f) agreements. *Ion Construction Redistrict Council of Painters, No. 16,* 593 F.Supp. 233 (N.D.Cal.1984), *affirmed,* 803 F.2d 1050 (9th Cir.1986); *John S. Griffith Construction Co. v. Carpenters,* 119 LRRM 2247, 1984 WL 49096 (C.D.Cal.1984, *reversed on other grounds,* 785 F.2d 706 (9th Cir.1986).

CIMCO also complains of the inconsistency of the IBEW's withdrawal from the GPA at the Union Carbide and Sterling Chemical plants, while maintaining participation in other GPAs throughout the nation. IBEW explained, however, that it is the International's policy not to force a local union to participate in a GPA for less than 100% of the prevailing area wage. CIMCO's attempt to characterize the IBEW's participation in the GPA as an all-or-nothing proposition overlooks the fact that the parties to the GPA are the individual contractor and the various international unions providing craftsmen at a particular site or to a particular employer. Each contractor secures a GPA for each individual site, establishing a contractual relationship between the contractor and the international unions *at that site.* Neither the plain language of the GPA nor its interpretation by the GPA Administrator reveals any contractual obligation on the part of a particular international union to participate in each and every GPA.

Having determined that the Board did not err in ordering CIMCO to bargain with Local 527, we now address the company's subsequent termination of electricians at the Sterling Chemical site.

IV.

TERMINATING THE ELECTRICIANS

CIMCO's final challenge to the Board stems from the company's termination of all electricians referred to the Sterling Chemical plant by Local 527's hiring hall. The Board rejected CIMCO's contention that those 34 workers "voluntarily quit" their employment as a necessary consequence of IBEW's withdrawal from the GPA, ruling that CIMCO's acts were "inherently destructive" of the electricians' § 7 rights within the meaning of *NLRB v. Great Dane Trailers,* 388 U.S. 26, 33–34, 87 S.Ct. 1792, 1797, 18 L.Ed.2d 1027 (1967), and therefore violated §§ 8(a)(1) and (3) of the Act.[13] In *Great Dane Trailers,* the Court held:

> Some conduct ... is so "inherently destructive of employee interests' that it may be deemed proscribed without the need for proof of an underlying improper motive.... That is, some conduct carries with it "unavoidable consequences which the employer not only foresaw but which he must have intended' and thus bears "its own indicia of intent'....

*Id.* (citations omitted). Concluding that the electricians had been terminated because they had been referred to CIMCO by Local 527, and that the company was attempting to pressure the IBEW into reinstating its participation in the GPA at the Sterling site, the Board rejected CIMCO's assertions that it believed Local 527 would no longer refer electricians to the Sterling facility, noting that the Union's business manager had notified the company that the electricians would continue to be referred on a non-union basis.[14] The Board reasoned that mass discharges or layoffs of union adherents are particularly destructive of the rights guaranteed them under § 7. "It is clear beyond peradventure," the administrative law judge concluded in his opinion, "that the discharge of all employees of a particular craft because of their affiliation with, and referral from, a union, as was the case herein,"

---

[13]In light of this conclusion, the Board found it unnecessary to address the issue of whether CIMCO's actions were motivated by anti-union animus under the analysis set forth in *Wright Line v. NLRB,* 251 NLRB 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

[14]Additionally, each of the electricians had made known their desire to continue working at the Sterling sites by submitting resumes to CIMCO prior to the IBEW's withdrawal from the GPA. CIMCO officials acknowledged that when informed they had "voluntarily quit" their jobs, the electricians protested vigorously.

is inherently destructive of employees' rights within the meaning of the *Great Dane Trailers* standard. Finally, the Board found that CIMCO failed to establish legitimate and substantial business justifications for terminating electricians at the Sterling site.[15] This court must affirm the Board's findings if they are supported by substantial evidence. *National Fabricators, Inc. v. NLRB,* 903 F.2d 396, 399 (5th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 671, 112 L.Ed.2d 664 (1991).

Given CIMCO's unwillingness to recognize Local 527 as the duly elected bargaining unit of electricians at the Sterling site, as well as the considerable evidence in the record that the electricians were terminated because they had been referred to that site by the union's hiring hall, we have little difficulty concluding that the company has engaged in conduct that "create[s] visible and continuing obstacles to the future exercise of employee rights" within the meaning of *Great Dane Trailers. Esmark, Inc. v. NLRB,* 887 F.2d 739, 748 (7th Cir.1989) (*quoting Portland Williamette Co. v. NLRB,* 534 F.2d 1331, 1334 (9th Cir.1976)).[16] In its defense, predicated on the lack of substantial evidence to support the Board's determination, CIMCO characterizes itself as a victim of warring union interests. The company contends that the IBEW's withdrawal from the GPA at the Sterling site forced it to hire non-union electricians, in violation of the agreement's mandate that all covered employees be union members. "In a perverse application of § 8(a)(3) of the Act," CIMCO argues in its brief, "a company which operates all of its sites on a unionized basis, and which literally spent months trying to achieve a labor relation solution to a problem caused by Local 527 and the IBEW, only to have its efforts spurned, has been found to have violated the Act because it reluctantly took the action it was required to take under the GPA and under its obligations to Sterling Chemical."

The crux of CIMCO's theory is that in order to comply with the GPA, CIMCO was obliged

---

[15]Under *Great Dane Trailers,* once the Board has established that a company has engaged in conduct inherently destructive of employees' § 7 rights, the burden shifts to the employer to establish that it was motivated by legitimate objectives. 388 U.S. at 34, 87 S.Ct. at 1797.

[16]*Portland Williamette* specifically lists permanent discharge of workers for union activities as an example of "inherently destructive" conduct on the part of their employer. *Id.*

to employ only union workers at the Sterling Chemical plant. Consequently, when the IBEW withdrew its participation from the GPA, CIMCO was obliged to discharge the unrepresented electricians, who had become "non-union" employees. All of this assumes that the IBEW's withdrawal from the GPA at the Sterling site was improper—an assertion that we have already rejected. Moreover, it obscures the fact that CIMCO rehired several Local 527 members as non-union electricians within a few weeks after the IBEW's withdrawal from the GPA. CIMCO explains this apparent inconsistency by stating that it feared the threat of a disruptive strike by IBEW electricians similar to the picketing that occurred at the Union Carbide site.[17] To the contrary, local union officials testified that they had extended assurances to CIMCO that Local 527 would not interfere with electricians after the effective date of the IBEW's withdrawal from the GPA. Underscoring their testimony is the undisputed evidence that the electricians vociferously protested when informed that they were "voluntarily" terminating their employment at the Sterling Chemical site. The Board also found that CIMCO's claim that the Sterling site would be targeted for a strike unless the electricians were terminated was not well founded. Besides significant differences in labor

---

[17]In the proceedings before the ALJ, CIMCO's counsel repeatedly sought to introduce evidence of Local 527's picketing at the Union Carbide facility, which resulted in work disruptions. The ALJ refused to admit this evidence, which CIMCO insists would have supported its claim that Local 527 electricians would have refused to man the Sterling site once the IBEW had withdrawn from GPA. Such evidence, CIMCO argues, would have been helpful in establishing its legitimate business motivation for fearing that the Sterling Chemical site would be disrupted by Local 527 members. In light of the evidence that the union planned to continue referring electricians to the Sterling plant on a non-union basis after the IBEW's withdrawal from the GPA at that site, we do not believe CIMCO was prejudiced by this decision.

Additionally, CIMCO complains that it was not allowed to cross-examine witnesses called by the NLRB counsel with regard to Union Carbide site activities. Specifically, the company argues that it should have had the opportunity to present evidence questioning the credibility of the IBEW witnesses regarding whether representatives of the International told CIMCO that the Sterling Chemical and Union Carbide facilities would not be manned by Local 527 electricians. This point is similarly without merit. CIMCO had ample opportunity to cross-examine these witnesses in laying the foundation for its legitimate business necessity defense.

More fundamentally, CIMCO overlooks the substantial differences between labor conditions at the two sites. For instance, the ALJ found the Local 527 never overtly threatened to picket the Sterling Chemical plant, apparently because the incumbent electricians there would have risked permanent replacement had they struck. In contrast, there were no incumbent electricians at the Union Carbide facility, thus allowing the union to strike there without endangering the jobs of its members.

relations between that facility and the Union Carbide plant, the Board noted that prior to the IBEW's withdrawal from the GPA, Sterling site electricians filed applications to work as non-union electricians and assured CIMCO officials that Local 527 administrators had promised not to interfere if they continued to work there.

In sum, substantial evidence supports the Board's conclusion that CIMCO terminated the electricians solely to bring pressure on the IBEW to reverse its withdrawal from the GPA, and that this action was destructive of their collective bargaining rights under § 7 of the Act.

V.

CONCLUSION

Because the NLRB did not abuse its discretion in these three cases, we enforce its orders in their entirety.